UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION, a Delaware Corporation, | ) CASE NO.: 1:23-cv-10233-ADB<br>)<br>) |
| Plaintiff, | ) **PLAINTIFF'S MOTION TO** |
| | ) **EXCLUDE ROB WALLACE'S** |
| v. | ) **EXPERT TESTIMONY**<br>) |
| PRIMARK US CORP., a Delaware Corporation; and DOES 1-10, inclusive, | )<br>)<br>) |
| Defendant. | )<br>)<br>) |

**PLAINTIFF'S MOTION TO EXCLUDE**

**ROB WALLACE'S EXPERT TESTIMONY**

**MOTION TO EXCLUDE ROBERT WALLACE**

## TABLE OF CONTENTS

I.     APPLICABLE LEGAL PRINCIPLES ..................................................1

II.    WALLACE'S CONFUSION TESTIMONY IS IRRELEVANT AND MUST BE EXCLUDED BECAUSE HIS SURVEY DOES NOT CONSIDER POST-SALE CONFUSION .......................4

    A.    Wallace's Survey Methodology Examines Irrelevant Consumer  Confusion...................................................................7

        a.    Shopping Context Instructions ..........................................7

        b.    Retail Environment Emphasis ...........................................7

        c.    Focus on Purchase Decision ..............................................9

    B.    Wallace's Results Are Irrelevant to Post-Sale Confusion .........9

    C.    The Survey Design Flaws Cannot Be Cured Through Cross-Examination...........................................................9

III.   WALLACE'S SURVEY METHODOLOGY IS FUNDAMENTALLY FLAWED AND UNRELIABLE ......................10

    A.    Wallace's Survey Design if Flawed.......................................11

    B.    Wallace's Universe is Overbroad...........................................13

    C.    Wallace's Control Stimuli Are Fatally Flawed..........................17

    D.    Wallace Created False Marketplace Context ............................18

IV.   WALLACE'S TESTIMONY PRESENTS SUBSTANTIAL RISK OF JURY CONFUSION AND SHOULD BE EXCLUDED UNDER 403........................................................23

MOTION TO EXCLUDE ROBERT WALLACE

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*American Footwear Corp. v. General Footwear Co.*,
609 F.2d 655, 661 n. 4 (2d Cir.1979) ...............................................19

*Au-Tomotive Gold, Inc. v. Volkswager of America, Inc.*,
457 F. 3d 1062, (9th Cir. 2006) ...................................................6

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*,
376 F.3d 8, 16 (1st Cir. 2004).....................................................5

*Bern Unlimited, Inc. v. Burton Corp.*,
95 F. Supp. 3d 184, (D. Mass. 2015).............................................1

*Clark v. Edison*,
881 F. Supp. 2d 192, (D. Mass. 2012)..........................................24

*Conopco, Inc. v. Cosmair, Inc.*,
49 F.Supp.2d 242, (S.D.N.Y.1999) ..............................................19

*Damon v. Sun Co.*,
87 F.3d 1467, (1st Cir.1996)........................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ................... 1, 2, 23, 24

*General Elec. Co. v. Joiner*,
522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) .............................3

*Gucci America, Inc. v. Guess?, Inc.*,
831 F. Supp. 2d 723, (S.D.N.Y. 2011) ...........................................4, 8

*H-D U.S.A., LLC v. SunFrog, LLC*,
311 F. Supp. 3d 1000 (E.D. Wis. 2018) ..........................................6

*I.P. Lund Trading ApS v. Kohler Co.*,
163 F.3d 27, (1st Cir. 1998.)..........................................................9

*Levi Strauss & Co. v. Blue Bell, Inc.*,
632 F. 2d 817 (9th Cir. 1980) ........................................................6

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
799 F.2d 867, (2d Cir. 1986) ......................................................4, 5

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558, (S.D.N.Y.2007) ......................................... 18, 19, 20

*Martinez v. United States*,
33 F.4th 20, (1st Cir. 2022)...........................................................3

**MOTION TO EXCLUDE ROBERT WALLACE**

*Mastercrafters Clock & Radio Co. v. Vacheron Constantin-Le Coultre Watches,*
    221 F. 2nd 464 (2nd Cir. 1955) ...................................................................5

*Mobil Oil Corp. v. Pegasus Petro. Corp.,*
    818 F.2d 254, (2d Cir. 1987) .....................................................................5

*Montblanc-Simplo GmbH v. Staples, Inc.,*
    172 F. Supp. 2d 231, 243 (D. Mass 2001) ...............................................4

*Nabisco v. Warner–Lambert Co.,*
    32 F.Supp.2d 690, (S.D.N.Y.1999) .........................................................17

*Payless Shoesource, Inc. v. Reebok Intern. Ltd.,*
    998 F.2d 985, (Fed. Cir. 1993) .................................................................5

*Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.,*
    161 F.3d 77, (1st Cir.1998) .......................................................................2

*Samaan v. St. Joseph Hosp.,*
    670 F.3d 21, (1st Cir. 2012) ......................................................................2

*Saxon Glass Techs., Inc. v. Apple Inc.,*
    393 F. Supp. 3d 270, (WDNY 2019) ......................................................21

*Sears Roebuck and Co. v. Sears Realty Co., Inc.,*
    1990 WL 198712, (N.D.N.Y. 1990) .......................................................16

*Shire City Herbals, Inc. v. Blue,*
    410 F. Supp. 3d 270 (DC Mass. 2019) ...................................................17

*SquirtCo. v. Seven—Up Co.,*
    628 F.2d 1086 (8th Cir. 1980) ................................................................11

*Sterilite Corp. v. Olivet Int'l, Inc.,*
    No. 1:22-CV-10327-JEK, 2024 WL 4349271, (D. Mass. Sept. 30, 2024.) ......................................................................................................2

*THOIP v. Walt Disney Co.,*
    690 F. Supp. 2d 218, (S.D.N.Y. 2010) ...............................................3, 10

*Union Carbide Corp. v. Ever—Ready, Inc.,*
    531 F.2d 366 (7th Cir. 1976) ..................................................................11

*United States v. Diaz,*
    300 F.3d 66, (1st Cir.2002) .......................................................................1

## OTHER AUTHORITIES

Reference Guide on Survey Research,
    in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE,
    (Federal Judicial Center 2000) ...............................................................17

**MOTION TO EXCLUDE ROBERT WALLACE**

## <u>RULES</u>

Fed. R. Evid. 403 ...................................................................................................23

Fed. R. Evid. 702(a)-(d) ........................................................................... 3, 23, 24, 25

**MOTION TO EXCLUDE ROBERT WALLACE**

## INTRODUCTION

Plaintiff Deckers Outdoor Corporation ("Deckers") moves to exclude the testimony of Rob Wallace ("Wallace") tendered by Defendant Primark US Corp. ("Primark") under *Daubert*, First Circuit law, Federal Rule of Evidence 702, and 403. Wallace's testimony is irrelevant and fundamentally flawed. Instead of assessing the post-sale confusion at issue in this case, Wallace tests only for initial interest confusion or point of sale confusion in the context of an individual purchaser. What's more, his methodology and controls as to confusion and secondary meaning are demonstrably unreliable, and his findings are directly contradicted by proper scientific analysis. For the reasons set forth below, his testimony and report must be excluded.

## ARGUMENT

### I.    APPLICABLE LEGAL PRINCIPLES

"The adoption of Rule 702 in its present form codified the standard of admissibility for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir.2002)." *Bern Unlimited, Inc. v. Burton Corp.,* 95 F. Supp. 3d 184, 201–02 (D. Mass. 2015).

"Federal Rule of Evidence 702 provides: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

1

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

*Sterilite Corp. v. Olivet Int'l, Inc.,* No. 1:22-CV-10327-JEK, 2024 WL 4349271, at *4 (D. Mass. Sept. 30, 2024.)

"The Rule was recently amended, effective December 1, 2023, to 'emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is **more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule.**' Fed. R. Evid. 702, Adv. Comm. Notes 2023 Amendments. [(Emphasis added.)] The amendments clarify that 'the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of' admissibility, not weight. *Id.* The amendments also 'emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology.' *Id at 4.*" As *Bern* explains:

"The requirement that an expert's testimony must be based on a reliable scientific foundation is often the 'central focus of a *Daubert* inquiry.' *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 81 (1st Cir.1998). That requirement ensures that 'the reasoning or methodology underlying the testimony is scientifically valid and ... that [the] reasoning or methodology properly can be applied to the facts in issue.' *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786." *Bern Unlimited, Inc.* at 184, 202.

"In other words, Rule 702 requires the court to 'ensure that there is an adequate fit between the expert's methods and his conclusions.' *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012) (citing *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786). Significant analytical gaps between the data and the opinion proffered by an expert may undermine

2

**MOTION TO EXCLUDE ROBERT WALLACE**

the reliability of an expert's testimony. *See, General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). A court may choose to exclude an expert's opinion when it is "based on conjecture or speculation from an insufficient evidentiary foundation," *Damon v. Sun Co.,* 87 F.3d 1467, 1474 (1st Cir.1996) (internal quotation marks omitted), or when it is "connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co.,* 522 U.S. at 146, 118 S.Ct. 512." (Emphasis added.) *Id*, at 184, 202.

The First Circuit has emphasized that relevance serves as a threshold inquiry under Rule 702 alongside reliability. In *Martinez v. United States*, the court upheld exclusion of expert testimony where plaintiffs failed to establish both elements, explaining that "to be considered relevant" expert testimony "must help the trier of fact to understand the evidence or determine a fact in issue," while reliability requires that the testimony be "based on sufficient data and/or facts and [be] the product of trustworthy principles." 33 F.4th 20, 27 (1st Cir. 2022) (citing Fed. R. Evid. 702(a)-(d)). Both requirements must be satisfied for expert testimony to be admissible. *Id.*

A "survey suffer[ing] from substantial methodological flaws . . . will be excluded under both Rule 403 and Rule 702." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007). "In cases arising under the Lanham Act, the Court's gatekeeper function is of heightened importance because the pivotal legal question virtually demands expert survey research on issues such as consumer perception." *Id.* at 562. And "[w]here, as here, a trademark action contemplates a jury trial rather than a bench trial, the court should scrutinize survey evidence with particular care." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010)

**MOTION TO EXCLUDE ROBERT WALLACE**

## II.    WALLACE'S CONFUSION TESTIMONY IS IRRELEVANT AND MUST BE EXCLUDED BECAUSE HIS SURVEY DOES NOT CONSIDER POST-SALE CONFUSION

Wallace's entire survey methodology is fatally flawed because it tests exclusively for initial interest and/or point-of-sale confusion during the purchasing process rather than post-sale confusion - the actual issue in this case. This fundamental disconnect between Wallace's methodology and the relevant legal question renders his testimony irrelevant and unreliable under Federal Rule of Evidence 702 and therefore requires its exclusion.

This distinction between point-of-sale and post-sale confusion is crucial, as courts have recognized that **surveys designed to measure one type of confusion are irrelevant to measuring the other**. In *Gucci America, Inc. v. Guess?, Inc*., Judge Scheindlin excluded expert surveys that tested only point-of-sale confusion where post-sale confusion was at issue, noting that "the differences between point-of-sale confusion and post-sale confusion are such that a survey designed to measure the former is irrelevant to the latter." 831 F. Supp. 2d 723, 747 (S.D.N.Y. 2011). While this decision is not binding on this Court, its reasoning is instructive - surveys must be designed to test the specific type of confusion at issue in the case.

There are numerous types of potential confusion:

**Point-of-sale confusion** is purchaser confusion of source which occurs at the time of purchase.  McCarthy at §23:5.

**Post-sale confusion** occurs when consumers see defendant's products outside the retail context and mistakenly associate them with the plaintiff's mark. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co*., 799 F.2d 867, 873-84 (2d Cir. 1986); *Montblanc-Simplo GmbH v. Staples, Inc*., 172 F. Supp. 2d 231, 243 (D. Mass 2001)("An action for trademark infringement under the Lanham Act may be based on post-sale confusion of consumers other than direct purchasers, including

4

observers of an allegedly infringing product in use by a direct purchaser, donees, or second-hand purchasers."); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 16 (1st Cir. 2004).

**Initial-interest confusion** protects against confusion that is dispelled before point of sale (*e.g.*, because close inspection of the product dispels confusion), in recognition of the fact that a defendant can gain "crucial credibility" with consumers due to a perceived initial association with plaintiff. *Mobil Oil Corp. v. Pegasus Petro. Corp.*, 818 F.2d 254, 259 (2d Cir. 1987)

Significantly in this case, post-sale confusion occurs when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product. "[S]uch confusion occurs, for example, when a consumer observes someone wearing a pair of Payless accused shoes and believes that the shoes are Reebok's. As a consequence, the consumer may attribute any perceived inferior quality of Payless shoes to Reebok, thus damaging Reebok's reputation and image." *Payless Shoesource, Inc. v. Reebok Intern. Ltd.*, 998 F.2d 985, 989 (Fed. Cir. 1993).  In a leading case on point, *Mastercrafters Clock & Radio Co. v. Vacheron Constantin-Le Coultre Watches*, 221 F. 2nd 464 (2nd Cir. 1955), Judge Frank held that "at least some customers would buy [the copier's] cheaper clock for the purpose of acquiring the prestige gained by displaying what many visitors at the customers' homes would regard as a prestigious article.  [The copier's] wrong thus consisted of the fact that such a visitor would be likely to assume that the clock was an Atmos clock …. [T]he likelihood of such confusion suffices to render [the copier's] conduct actionable." See also McCarthy at §23:7.

In *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986) the court recognized the potential for post-sale confusion where a "consumer seeing the familiar stitching pattern [on defendant's jeans] will associate the jeans with [plaintiff Levi] and that association will influence his buying

5

**MOTION TO EXCLUDE ROBERT WALLACE**

decisions." See also *Levi Strauss & Co. v. Blue Bell, Inc*., 632 F. 2d 817 (9th Cir. 1980)("Wrangler's use of its projecting label is likely to cause confusion of Strauss's mark and who observe Wrangler's projecting label after the point of sale.") Courts have consistently held that a likelihood of post-sale confusion by the general public is sufficient to establish liability for trademark infringement. See 3 MCCARTHY, supra, § 23:7 (citing and discussing cases).

Similarly, in *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000 (E.D. Wis. 2018), the court observed "[Defendant] could not (and does not) credibly contend that post-sale confusion is unlikely.  The very purpose of buying a cheaper, knockoff version of a Harley Davidson product … is to create association with the iconic brand at a lower cost …. This runs the risk that consumers viewing a knockoff post-sale will see the low quality of the item and be dissuaded from purchasing a real Harley Davidson product."

The logic behind this is obvious.  Unlike a point-of-sale situation where there is a potential purchaser viewing the junior user's product in a store or online and is deceived into making the purchase believing it is originating from, affiliated with, or otherwise authorized by the senior user; post-sale confusion occurs out on the street and involves the confusion of a third-party viewing the junior user's item on someone else.  *Payless* at 990 ("post-sale observers may be unaware that Payless and [adidas] shoes are sold in different stores or at different prices, yet their confusion may be detrimental to [adidas].");  *Au-Tomotive Gold, Inc. v. Volkswager of America, Inc*., 457 F. 3d 1062, 1077 (9th Cir. 2006); *Montblanc* at 243 ("Point-of-sale disclaimers do not address the problem of post-sale confusion by non-purchasers.").

6

**MOTION TO EXCLUDE ROBERT WALLACE**

## A.    Wallace's Survey Methodology Examines Irrelevant Consumer Confusion

Wallace's survey expressly considers only confusion by the potential purchaser herself, not by the public after such a potential purchase. Therefore, regardless of whether the court deems the survey to examine initial interest or point of sale confusion, it cannot examine post sale confusion. The stark contrast between Wallace's methodology and the proper approach for testing post-sale confusion, as demonstrated by the Ezell survey, reveals that Wallace tested solely for initial interest confusion.

### a.    Shopping Context Instructions

Wallace explicitly frames his entire survey around a retail shopping context, repeatedly instructing respondents to evaluate the products "as if you were shopping for casual shoes with the possible intent to purchase these products." Wallace Survey One ("Exhibit A") and Wallace Survey Two ("Exhibit B.")  (Ex A, p. 8; Ex. A, p. 10; Ex. B, Q.10a; Ex. B, Q.10b). While initial product viewing instructions may be necessary in any survey, Wallace goes far beyond mere viewing instructions to embed his entire methodology in a retail context.

### b.    Retail Environment Emphasis

Wallace's methodology consistently emphasizes retail shopping contexts across both of his surveys. In Wallace Survey One ("Exhibit A" or "Ex. A") he explicitly simulates a comparison shopping experience, instructing respondents "In shopping for casual shoes, you first come across this product:" and then "Later you come across this product:" (Ex. A, Q10a-11a). This sequential presentation directly tests confusion during the shopping/browsing process, as if a consumer is comparing products while shopping - a classic test for initial interest confusion that bears no relation to how post-sale confusion occurs in the real world.

**MOTION TO EXCLUDE ROBERT WALLACE**

Furthermore, if the survey were interpreted as point of sale, the *Gucci* court squarely rejected attempts to salvage point-of-sale surveys for post-sale confusion claims, explaining that "because of the vast differences between the way that consumers examine products at the point of sale and the way they notice products in a post-sale environment, the fact that consumers are not confused when they see [a mark] at the point of sale does not indicate that they will not be confused when they see [it] in passing in a typical post-sale environment." *Gucci* at 746. While not binding on this Court, this analysis highlights why Wallace's methodology focusing on careful examination in retail settings cannot reliably measure post-sale confusion.

Wallace Survey Two ("Ex B") doubles down on this retail focus by placing the products in an explicit retail context, instructing respondents to "consider the context as to where you would see this product for sale" and showing pictures of retail environments. (Ex. B, Q.13a, Q.13b). He further emphasizes the retail context by providing store names and asking about source identification "based on the look of the shoe and the retail experience where it is sold." (Ex. B, Q.13a, Q.13b).

This approach stands in direct contrast to the proper methodology for testing post-sale confusion, as demonstrated by the Ezell survey, which showed products in isolation as they would be encountered in post-sale contexts, without retail environments or point-of-sale information that wouldn't be available to post-sale observers. (Ezell Expert Report ¶18-19). By showing each respondent only a single product in isolation, Ezell's methodology properly simulates how post-sale confusion occurs - when consumers encounter products being worn in the real world, not during comparison shopping. This distinction is crucial because post-sale confusion occurs when "consumers viewing the [product] on other people

**MOTION TO EXCLUDE ROBERT WALLACE**

would be confused as to the origin of the goods." *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 44 (1st Cir. 1998.)

### c. *Focus on Purchase Decision*

The Wallace survey questions focus entirely on confusion before or during the purchase decision. In his first survey, Wallace asks whether consumers believe the shoes come from "the same or affiliated sources/manufacturers" specifically "in shopping for casual shoes." (Ex. A, Q.11a). This purchase-focused framing continues throughout both surveys, with every source identification question explicitly tied to a retail or shopping context. (Ex. A, Q.10a-12a; Ex. B, Q.10a-14b).

### B.  Wallace's Results Are Irrelevant to Post-Sale Confusion

Because Wallace's methodology tests for the wrong type of confusion, his results provide no insight into the actual likelihood of post-sale confusion. His finding that only "38.5% of primary set of respondents... believe that the products in question come from the same or affiliated sources" (Report ¶15) is meaningless because those respondents were evaluating the products in an artificial retail context that bears no relationship to post-sale encounters.

Similarly, his source identification findings - that certain percentages of respondents could or could not identify the source in a retail context - tell us nothing about whether post-sale observers would be confused about source when encountering the products being worn. The entire premise of post-sale confusion is that it occurs in contexts where source-identifying retail information is not available.

### C.  The Survey Design Flaws Cannot Be Cured Through Cross-Examination

The disconnect between Wallace's methodology and the relevant confusion inquiry cannot be cured through cross-examination. His surveys simply did not collect any data about post-sale confusion. No amount of questioning can transform

9

point-of-sale confusion data into evidence of post-sale confusion. *See Iconics*, 266 F.Supp.3d at 469 (methodological flaws that go to foundation of expert's analysis cannot be cured through cross-examination).

## III. WALLACE'S SURVEY METHODOLOGY IS FUNDAMENTALLY FLAWED AND UNRELIABLE

Beyond testing for the wrong type of confusion and reaching conclusions contradicted by his own data, Wallace's survey methodology contains fatal structural flaws that render his conclusions wholly unreliable such that the prejudice to a jury substantially, if not extraordinarily, outweighs any probative value they may offer.

"While errors in survey methodology usually go to weight of the evidence, a survey should be excluded under Rule 702 when it is invalid or unreliable, and/or under Rule 403 when it is likely to be insufficiently probative, unfairly prejudicial, misleading, confusing, or a waste of time.[105] *THOIP v. Walt Disney Co.,* 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010)

"To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts. *Id* at 230.

Furthermore, in *Gucci*, the court found that a survey's "use of an unrepresentative test [product]" that failed to reflect actual marketplace conditions was a sufficiently serious flaw to justify excluding the survey entirely, even though many methodological issues would normally only affect weight. 831 F. Supp. 2d at 744-45. Similarly, Wallace's methodological flaws - including an improper

**MOTION TO EXCLUDE ROBERT WALLACE**

controls, flawed test samples, inappropriate universe, and questions that test reading comprehension rather than confusion - are so fundamental that they render his results wholly unreliable under Rule 702's standards.

### A.    Wallace's Survey Design if Flawed

Most likelihood of confusion surveys are adaptions of one of two formats: the *Eveready* Format or the *Squirt* Format. 6 McCarthy on Trademarks § 32:173 (5th ed.) (discussing trademark survey formats adapted from *Union Carbide Corp. v. Ever—Ready, Inc*., 531 F.2d 366 (7th Cir. 1976) and *SquirtCo. v. Seven—Up Co*., 628 F.2d 1086 (8th Cir. 1980)).

The *Eveready* format is often used in a case where one party-entity is well-known, while the other is a small, lesser-known company. There is no side-by-side comparison of the mark and the allegedly infringing use: This format assumes that the larger company is "top of mind" and that respondents could recall their marketplace encounters with the larger entity from memory. *Ever—Ready, Inc*., 531 F.2d at 366. [1]

"The *Squirt* [F]ormat is the alternative for testing the likelihood of confusion between marks that are weak, but are simultaneously or sequentially accessible in the marketplace for comparison." J.B. Swann, *Likelihood of Confusion Studies and the Straightened Scope of Squirt*, 98 Trademark Rptr 739, 755-756 (2008). *Squirt* surveys should be used where (1) "accessibility of the senior mark in memory is low to nonexistent" and (2) "the brands exist together in the market or one is typically encountered sufficiently soon after the other." Id. In the *Squirt* Format, survey respondents are shown an array of marks, in a manner that is designed to replicate the marketplace where they would appear, and are asked whether they

---

[1] Because this case involves the well known UGG Classic Ultra Mini trade dress, Deckers' witness, Ezell, properly employed the *Eveready* format.

**MOTION TO EXCLUDE ROBERT WALLACE**

believe the uses come from the same or affiliated companies and if yes, what makes them believe that. Id. at 749. "When ascertaining whether a survey methodology sufficiently simulates marketplace conditions, the focal point must be the specific products tested by the survey." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010).

The Wallace Survey is a form of a *Squirt* survey — a format where products are placed side-by-side, along with controls, "and participants are asked questions to determine if confusion exists as to the source of the products." *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 233 (3rd Cir. 2017) (citing Jerry B. Swann, Likelihood of Confusion Studies and the Straitened Scope of Squirt, 98 Trademark Rep. 739, 749-50 (2008)). McCarthy defines it as a "look, pause, look" survey. *McCarthy* at §32:177.

Here, there is no evidence that the UGG Classic Ultra Mini and the Accused Product ever appeared in close proximity in the marketplace. Indeed, Primark has argued the exact opposite to this Court: "To put it simply, no rational consumer purchasing Primark's Tan Faux Suede Mini Boot in a Primark store (the only place they can) would mistakenly believe that they are purchasing a Deckers product." ECF No. 60, pgs. 28 & 29. Wallace failed to sufficiently approximate the manner in which consumers encountered the parties' products in the marketplace. While courts are highly skeptical of *Squirt* surveys, they are not prohibited. However, courts do prohibit placing trademarks side-by-side in a survey if doing so would create an artificial situation that does not reflect the marketplace, as Wallace did here. *Jordache Enters. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487-88 (10th Cir. 1987); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 235 (S.D.N.Y. 2010) ("[A] sequential presentation of the two marks at issue (or array [including controls]) is appropriate only if it reflects a significant number of real-world situations in which both marks at issue are likely to be evaluated sequentially or

**MOTION TO EXCLUDE ROBERT WALLACE**

side-by-side."); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 136, 1147 (10th Cir. 2013) (rejecting Squirt-type survey where expert cited no evidence that parties' products "were sold side-by-side in stores").

Furthermore, as the Ezell survey and Deckers' sales figures reflect, the UGG Classic Ultra Mini does not suffer from low accessibility. Rather, it has been one of the most successful footwear items sold in America over the past few years.

**B.    Wallace's Universe is Overbroad**

The selection of a proper universe is one of the most important factors in ensuring the reliability of a survey. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980). Selection of a proper universe is critical because "even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003) (quoting 5 McCarthy, § 32:159 at 32-250.3). A proper universe of respondents includes the people whose opinions are relevant to the question at hand. The goal is to survey a group of people that is representative of this population. See *Rocky Brands, Inc. v. Red Wing Shoe Co.*, No. 2:06-cv-00275, 2009 U.S. Dist. LEXIS 122929, 2009 WL 5125475, at *4-5 (S.D. Ohio Dec. 28, 2009) (asking whether surveyed patrons adequately represented likely purchasers of the product at issue).

A survey is of "dubious value" where its universe is not keyed to the relevant market. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 652 F. Supp. 1105, 1110-11 (S.D.N.Y. 1987), aff'd, 830 F.2d 1217 (2d Cir. 1987), overruled on other grounds, *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir. 1993); see also *LVL XIII Brands*, 209 F. Stipp. 3d at 643 (finding survey universe not tied to relevant market). "[I]f the wrong [universe is surveyed], the results are likely to be irrelevant." *Medisim Ltd v. BestMed LLC*, 861 F. Supp. 2d 158, 179 (S.D.N.Y. 2012) (second alteration in original) (citation

13

**MOTION TO EXCLUDE ROBERT WALLACE**

omitted), aff'd on reconsideration in part, No. 10 Civ. 2463 (SAS), 2012 U.S. Dist. LEXIS 56800, 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012). To avoid being overinclusive, such a survey should "encompass only the potential buyers of the products at issue." *Lon Tai Shing Co. v. Koch+Lowy*, No. 90 Civ. 4464 (LJF), 1992 U.S. Dist. LEXIS 673, 1992 WL 18806, at *3 (S.D.N.Y. Jan. 28, 1992). To avoid being underinclusive, it must not "defin[e] a group narrower than the ideal universe, thus leaving out a group of persons whose perception is relevant." 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:161 (5th ed. 2022).  "A survey should be excluded 'when the sample is clearly not representative of the universe it is intended to reflect.'" *Mini Melts, Inc. v. Reckitt Benckiser, Inc*., No. 4:07-CV-271, 2009 WL 10677599, at *6 (E.D. Tex. Feb. 26, 2009) (Bush, Mag.) (quoting *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc*., 82 F.3d 1533, 1544 (10th Cir. 1996))

Here, both the UGG Classic Ultra Mini and Accused Product are boots sold almost exclusively to women.  However, instead of limiting the universe to women between 18-65 who have or are planning on purchasing boots, Wallace's defined universe has anyone between 18-15 who has or are planning on purchasing <u>casual shoes</u>.  Casual shoes are essentially any shoes used for everyday use, and include but are not limited to loafers, boots, sneakers, boat shoes, clogs, and moccasins. Basically anything other than high-heels.

In similar circumstances, several courts have determined that the survey's universe was overbroad. For example, in *Schieffelin & Co. v. Jack Company of Boca, Inc.*, 850 F. Supp. 232, 246 (S.D.N.Y. 1994), a trademark dispute between the distributors of Dom Perignon champagne and the makers of a novelty bottle of popcorn called Dom Popingnon, the plaintiff introduced a survey where the universe was defined as all persons between the legal drinking age and the age of 64. The court held that such a universe was overbroad:

**MOTION TO EXCLUDE ROBERT WALLACE**

The court can hardly believe that the mere fact that interviewees had reached the drinking age rendered them the equivalent of potential consumers for DOM PERIGNON. Rather the better definition of the universe in this case would have been that group of consumers who were in the market for DOM PERIGNON, or at least for champagne. Id..

Similarly, in *Weight Watchers International, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990), the district court criticized a survey designed to show a likelihood of confusion between two diet frozen food manufacturers, where the universe was defined as women between the ages of 18 and 55 who had purchased frozen food entrees in the past six months and who had tried to lose weight through diet and /or exercise. Although some screening criteria was used in that case, the court still held that the universe was too broad since it did not limit the universe to purchasers of diet frozen food or individuals who had tried to lose weight through diet rather than exercise. *Id*. As a result, the court concluded that some survey respondents "may not have been in the market for diet food of any kind," and therefore would be "less likely to be aware of and to make relevant distinctions when reading ads than those who are potential consumers." *Id*. at 1272-73.

The criticism levelled at the *Schieffelin* and *Weight Watchers* surveys is equally applicable to the case at bar. No effort was made to screen the respondents more specifically to determine whether they possessed characteristics "relevant to the mental associations at issue," *Schieffelin*, 850 F. Supp. at 246, such as women interested in purchasing boots. The only connection offered between the universe selected and each party's customer base was that people wear footwear.

In utilizing an overinclusive universe, basically anyone who wears shoes, Wallace diluted and otherwise manipulated the survey to generate artificially low

15

**MOTION TO EXCLUDE ROBERT WALLACE**

results.   Cf. *Sears Roebuck and Co. v. Sears Realty Co., Inc*., 1990 WL 198712, *13 (N.D.N.Y. 1990) (finding significant flaws in a survey universe because "no evidence was offered to demonstrate that the age or gender qualification chosen . . . correlated with the relevant consumer market.").[2]  Wallace's survey was recently disregarded by this Court in *Shire City Herbals, Inc. v. Blue*, 410 F. Supp. 3d 270 (DC Mass. 2019) for using an overinclusive universe.[3] It should be similarly disregarded here.

---

[2] Based on his prior opinions, it is reasonable to conclude that Wallace's choice of an overinclusive universe was deliberate.  In *Blue Bottle Coffee, LLC v. Chuan Liao*, 2023 U.S. Dist. LEXIS 234802 (ND Cal. Nov. 30, 2023), Wallace opined: "Wallace found that the "chief flaw" in Harper's survey is Harper's "failure to define, much less address, 'relevant consumers.'" Id. ¶ 14. Specifically, Blue Bottle exists in the "Third Wave" coffee market—focused on "extremely high-quality estate-grown coffees and artisan production techniques," and made up of consumers "sensitive to authenticity and willing to pay a steep premium for the quality and craft behind it." Id. ¶ 20. While Starbucks, a major "Second Wave" brand of coffee, sells for roughly $17-per-pound, Plaintiff's coffee sells for over $20-per-pound. Id. Wallace stated that by not screening for consumers who meet the "ultra-premium" coffee purchasing criteria, Harper's survey was "over-inclusive, in that it was designed to include, and must surely have included, consumers who had never in the past year done anything more than purchase mass market coffee products from a convenience store, or a gas station." Id. ¶ 25. Wallace also stated that Harper's survey set the bar to entry in the survey too low by asking respondents whether they purchased coffee in the past "year," rather than a shorter time interval. Id. ¶ 26. In addition, Harper admitted into her survey respondents who had not purchased coffee at all in the past year, but who would in the next year; Wallace stated that the 17 people admitted on this basis should have been disqualified because "someone who had absolutely no occasion to purchase any product related to coffee even once in the past year" cannot be "trusted to predict they will purchase any of those products in the next year." Id. ¶ 28"

[3] Given the nature of the product, the relevant purchasing public is a more limited group than the entire adult population. Even though Plaintiff sells Fire Cider in all 50 states and in a variety of channels of trade, Plaintiff has not demonstrated that the entire population is likely to buy Fire Cider. The fact that Fire Cider is one of

**MOTION TO EXCLUDE ROBERT WALLACE**

## C.    Wallace's Control Stimuli Are Fatally Flawed

Wallace's chosen control stimuli fundamentally misunderstand the basic principles of experimental survey design. As Ezell explains, a proper control should "share as many characteristics with the [test] stimulus as possible, with the key exception of the characteristic[s] whose influence is being assessed." (Ezell Expert Report at ¶20).

"A control product is one that is a non-infringing product which is similar to the products at issue." *Nabisco v. Warner–Lambert Co.,* 32 F.Supp.2d 690, 700 (S.D.N.Y.1999) (citation omitted); Shari Seidman Diamond, *Reference Guide on Survey Research,* in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 258 (Federal Judicial Center 2000) ("In designing a control group study, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."). The use of an improper control may produce "an artificially low estimate of the normal degree of confusion affecting the purchase of products" bearing the mark at issue. *Reed–Union,* 77 F.3d at 912. *See also Cumberland,* 32 F.Supp.2d at 575 ("Given the inadequacy of the controls, one cannot determine from the data the extent of the relevant type of confusion by indirectly approximating the background noise."). *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 595 (S.D.N.Y.2007).

---

many products stocked in a mass-market grocery store or available through a popular website does not mean that all customers who shop at that store or on that website are people who might consider purchasing Fire Cider. Because the 2015 and 2017 surveys sampled an overbroad population, they have limited, if any, probative value. *Shire City Herbals*, 410 F.Supp. 3d at 289.

Wallace's control falls for short of propriety by retaining *all* of the claimed features of the UGG Classic Ultra Mini Trade Dress. (Ezell Rebuttal Report at ¶24.) Specifically, Wallace's control shoe retains:

- The exaggerated, raised and exposed circular stitch pattern
- The exposed tufting
- The raised and rounded vamp
- The suede heel overlay
- The fabric binding
- The thick, flat sole (Ezell Rebuttal Report at ¶23-24.)

By failing to remove these claimed trade dress elements from his control, Wallace's methodology cannot isolate or measure their influence on consumer confusion. The control provides no test characteristic, whatsoever. This renders his control results meaningless and undermines any conclusions drawn from comparing test and control responses. "Because Mr. Wallace failed to remove the 'active ingredient' from his control shoes, his controls do not provide a reliable baseline level of consumer association or confusion for reasons other than the claimed trade dress, and are therefore completely unreliable. (Ezell Rebuttal Report at ¶27.)

### D.    Wallace Created False Marketplace Context

*Wallace's Survey Improperly Focused on Irrelevant Sole Designs and Created False Distinctions That Would Not Exist in Real-World Post-Sale Encounters*

Wallace fatally compromised his survey's reliability by creating a false marketplace context that artificially deflated confusion levels. In both surveys, he presented participants with prejudicial and irrelevant photos while placing the products in retail settings where participants knew UGG products could not be sold. "[A] survey must use the proper stimulus, one that tests for confusion by replicating

marketplace conditions." *Conopco, Inc. v. Cosmair, Inc.*, 49 F.Supp.2d 242, 253 (S.D.N.Y.1999). Indeed, courts may exclude surveys that fail to replicate how marks are viewed by consumers in real life. *See American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 661 n. 4 (2d Cir.1979) (affirming rejection of survey that failed to replicate "actual marketing conditions"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007).

Wallace compromised his survey's validity by repeatedly presenting photographs emphasizing the soles of the boots - a perspective that emphasizes an element not claimed as part of the trade dress and fails to replicate real-world post-sale confusion conditions. See Ex. A, Q10a-11a (showing multiple sole views); Ex. B, Q13a-13b (same). In actual marketplace conditions where post-sale confusion occurs - such as observing boots being worn in public - consumers rarely if ever examine or even notice the bottom of another person's footwear. Even if they did, the soles in Wallace's photographs are highly distinguishable, with the UGG boots featuring a distinctive sun logo design that is well-known to consumers as a UGG brand identifier.

To be clear, Wallace used boots*, with UGG trademarks on them, in likelihood of confusion surveys, for UGG products.* Ex. A at Q10a (showing UGG sole with sun logo); Ex. B at Q13b (same).



| | |
|---|---|
| Wordmark | |
| Status | LIVE REGISTERED |
| Goods & services | IC 025: Footwear. |
| Class | 025 |
| Serial | 86706722 |
| Owners | Deckers Outdoor Corporation (CORPORATION; DELAWARE, USA) |

**MOTION TO EXCLUDE ROBERT WALLACE**

By then showing the same survey participant the following image, immediately thereafter, stating "Now you come across this product" and asking "do you believe that these shoes come from the same or affiliated sources/ manufacturers as the shoes you saw earlier?",



Wallace's methodology created artificial distinctions by focusing participants' attention on boot soles - features that are wholly irrelevant to this case, not part of the claimed trade-dress, and would never be visible in actual post-sale encounters. This focus on sole designs distorted the likelihood of confusion by highlighting distinguishing features that consumers could not observe in real-world conditions. Critically, the boot soles are neither an element of the asserted trade dress. By fixating on irrelevant features invisible in actual post-sale encounters, Wallace's survey fails to "replicate how the marks are viewed by consumers in real life" as required by *Malletier*, 525 F. Supp. 2d at 591, providing independent grounds for excluding his results.

In Wallace's second survey he tests the secondary meaning of Primark's Accused Product to somehow establish that the UGG Classic Ultra Mini does not have secondary meaning.[4]  Not only is this not an approved methodology (whether

---

[4] In Wallace Two, he inexplicably assigned the UGG product - which embodies the very trade dress at issue - to the control group rather than the test group. (Ezell Rebuttal Report at ¶33.) This fundamental error reveals both a lack of understanding of proper experimental design and a concerning inability to distinguish between the products that are the subject of his own confusion analysis. (Ezell Rebuttal Report at ¶¶34-35.)

a junior user's Accused Product has achieved secondary meaning is irrelevant), the flaws are even more egregious.

The only valid results in this survey are likely the responses to question 10-12 where Wallace shows the respondents the Accused Product and asks them whether they believe the boot came from one brand or source and why: <u>65% said UGG</u>. See Exhibit E&F. In question 13a, however, Wallace shows the respondents of a Primark store, tells them that the product is only sold in retail stores names Primark, and then asks where they believe the boot was made.



As this Court can imagine many of the respondents, primed by Wallace's leading question, answered Primark. "A survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all. Suggestive questions render a survey unreliable by creating 'demand effects' or 'cues' from which a respondent can 'infer the purpose of the survey and identify the "correct" answers." *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 287-288 (WDNY 2019).

Furthermore, "[i]n an apparent attempt to suppress the level of secondary meaning for the UGG product in question, Mr. Wallace provided respondents in Wallace Survey two (Ex B) with a *false* retail context. Specifically, he represented to his survey respondents that the UGG product they were shown in Wallace Survey (Ex B) were sold in Walmart retail stores, when they are not." (Ezell Rebuttal Report at ¶¶14.)

**MOTION TO EXCLUDE ROBERT WALLACE**

Provided is Wallace's Q13b: "Now please consider the context as to where you would see this product for sale. Please know that this product is sold in retail stores named Walmart, as illustrated below.



Based on the look of the shoe and the retail experience where it is sold what do you believe this product's brand name might be? In other words, what is the source that you associate with making this shoe?" Wallace Survey Two (Ex B) question thirteen at page six.

This false context materially affected respondents' answers, and destroys the validity of the study, as demonstrated by a mere sampling of participant's own answers to Question 13 provided individually by their ID number:

| ID | Q13b Response (emphasis added) |
|---|---|
| 19 | Well, **if its at Walmart its definitely Not Uggs** - LOL. I'm guessing Great Value brand. |
| 49 | **Definitely not Uggz because** that image shows a Walmart store & **that brand isn't sold at Walmart** |
| 58 | **I thought it was Uggs but they are sold elsewhere** so I am not sure what the brand is now |
| 120 | I would assume that it would not be a very well-known brand I am not sure on exact named but **walmart does not carry ugg's** or even bearclaws as far as I know. |
| 205 | **I don't know of any brand shoes sold at walmart.** |
| 228 | Generic, cheaper off brand. **Walmart does not carry the brand UGG.** |
| 234 | **i dont think wall mart would sell Uggs** and i dont know what wallmart carries |
| 372 | no idea, but **I don't think UGGs are sold at Walmart** |

Ezell Rebuttal Report at 16.

**MOTION TO EXCLUDE ROBERT WALLACE**

"Because Mr. Wallace misled respondents into believing that the UGG product they were shown is sold at Walmart stores, he suppressed the number of UGG responses to his survey. As seen in the responses above, this led respondents away from providing an UGG response and unfairly prejudices his results against Plaintiff. (*Id* at 32.)

## IV.  WALLACE'S TESTIMONY PRESENTS SUBSTANTIAL RISK OF JURY CONFUSION AND SHOULD BE EXCLUDED UNDER 403

Allowing Wallace to testify about his survey results would create serious risk of confusing and misleading the jury. His emphasis on retail contexts and point-of-sale confusion could lead jurors to focus on the wrong type of confusion entirely. Even if Wallace's testimony might survive scrutiny under Rule 702,  it should in the alternative be excluded under Rule 403.

"The fact that the evidence survives scrutiny under Rule 702 is not the end of the inquiry. As noted, Fed. R. Evid. 403 provides that otherwise-admissible evidence may be excluded if "its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury ...." In Daubert, the Supreme Court noted that Rule 403 may act as a backstop where expert testimony that is admissible under Rule 702 carries a risk of unduly influencing the jury: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Daubert, 509 U.S. at 595, 113 S.Ct. 2786 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991))." Clark v. Edison, 881 F. Supp. 2d 192, 215 (D. Mass. 2012).

This risk is heightened here because Wallace presents his methodology as scientific and reliable, complete with statistical analysis and control groups. But no

**MOTION TO EXCLUDE ROBERT WALLACE**

amount of statistical rigor can overcome the fundamental problem that he measured the wrong thing. Allowing him to present this analysis risks lending a false air of scientific validity to conclusions that are simply irrelevant to the actual legal issues.

## **CONCLUSION**

Wallace's testimony must be excluded under Rule 702, 403, Daubert, and First Circuit law. His methodology is fundamentally irrelevant because it tests only for initial interest confusion during the purchasing process rather than post-sale confusion - the actual issue in this case. His survey questions, all framed around retail shopping contexts, cannot provide meaningful insight into how consumers perceive these products in post-sale environments. Irrelevant information cannot help the trier of fact in litigation.

Beyond testing for the wrong type of confusion, Wallace's survey methodology contains fatal structural defects that render his conclusions wholly unreliable, including improper controls that retain all claimed trade dress elements, false marketplace contexts that artificially suppressed confusion rates, and a complete failure to address contradictory evidence - including his own data showing strong UGG source identification. Most remarkably, Wallace appears to have confused the test and control products himself in constructing his survey.

The dramatic disparity between Wallace's results and those obtained through proper methodology in the Ezell survey demonstrates that his flawed approach systematically understated actual confusion rates. These methodological flaws cannot be cured through cross-examination because they go to the very foundation of his analysis. Moreover, allowing Wallace to present his flawed methodology risks confusing and misleading the jury by lending a false air of scientific validity to conclusions that are demonstrably unreliable.

**MOTION TO EXCLUDE ROBERT WALLACE**

Because Primark cannot show it is "more likely than not" that Wallace's testimony meets Rule 702's admissibility requirements, and because any probative value is substantially outweighed by the danger of jury confusion under Rule 403, his testimony should be excluded in its entirety.

For all these reasons, the Court should grant Deckers' motion to exclude Wallace's expert testimony.

Dated: November 4, 2024    By:    _/s/ Brent H. Blakely_____
Brian L. Berlandi (643445)
**Berlandi Nussbaum & Reitzas LLP**
527 Route 22, Suite 2
Pawling, New York 12564
Telephone: 212-804-6329
Email: bberlandi@bnrllp.com

Brent H. Blakely (admitted *pro hac vice*)
Jamie Fountain (admitted *pro hac vice*)
**BLAKELY LAW GROUP**
1334 Parkview Avenue, Suite 280
Manhattan Beach, California 90266
Telephone: (310) 546-7400
Email: bblakely@blakelylawgroup.com
jfountain@blakelylawgroup.com

**Attorneys for Plaintiff**
**Deckers Outdoor Corporation**

**MOTION TO EXCLUDE ROBERT WALLACE**

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system and all

attachments will be sent electronically to the registered participants as identified on

the Notice of Electronic Filing (NEF).

By:    */s/ Brent H. Blakely*
Brent H. Blakely

**MOTION TO EXCLUDE ROBERT WALLACE**