# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

DECKERS OUTDOOR CORPORATION,

Plaintiff,

v.

PRIMARK US CORP.,

Defendant.

C.A. NO. 1:23-cv-10233-ADB

## DEFENDANT PRIMARK'S MEMORANDUM IN OPPOSITION TO DECKERS' MOTION TO EXCLUDE EXPERT OPINIONS OF ROBERT GRIFFIN WALLACE, JR.

Defendant Primark submits this memorandum of law in opposition to Plaintiff's motion to exclude the report and testimony of Robert Wallace ("Mr. Wallace"). (D.I. 72, "Defendant's Brief")

# TABLE OF CONTENTS

I.     SUMMARY ....................................................................................................1

II.    FACTUAL BACKGROUND ........................................................................1

III.   LEGAL STANDARD ..................................................................................2

IV.   ARGUMENT ................................................................................................3

     A.     Mr. Wallace's Surveys Appropriately Tested the Likelihood of Confusion between Deckers' Alleged Trade Dress and Primark's Accused Product ...............3

          1.    Deckers Never Alleged That Post-Sale Confusion is the Focus of its Likelihood of Confusion Case ....................................................4

          2.    Mr. Wallace's Survey is Relevant to Likelihood of Confusion, including Post-Sale Confusion....................................................5

     B.     Mr. Wallace's Survey Methodology is Fundamentally Sound and Reliable............8

          1.    Mr. Wallace's Survey Design is Proper ......................................................9

          2.    Mr. Wallace's Survey "Universe" is Appropriate .....................................10

          3.    Mr. Wallace's Selected Control is Appropriate .........................................15

          4.    Mr. Wallace Created an Appropriate Context for His Surveys .................17

     C.     Exclusion Under Rule 403 Is Not Proper In This Case .........................................20

V.    CONCLUSION.............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Bern Unlimited, Inc. v. Burton Corp.*
95 F. Supp. 3d 184 (D. Mass. 2015)........................................................ 3

*Capri Sun GmbH v. Am. Beverage Corp.*
595 F. Supp. 3d 83 (S.D.N.Y. 2022)....................................................... 8

*Cortes-Irizarry v. Corporacion Insular De Seguros*
111 F.3d 184 (1st Cir. 1997) .................................................................. 2

*Daubert v. Merrell Dow Pharms., Inc.*
509 U.S. 579 (1993) .............................................................................. 2

*Diefenbach v. Sheridan Transp.*
229 F.3d 27 (1st Cir. 2000).................................................................... 2

*GE v. Joiner*
522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997) ...................................... 3

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*
No. 18-cv-5290-CM, 2023 WL 6614486 (S.D.N.Y. Sept. 20, 2023)....................................... 17

*Gucci A., Inc. v. Guess?, Inc.*
831 F.Supp.2d 723 (S.D.N.Y. 2011).................................................. 4, 6

*Hilsinger Co. v. Kleen Concepts*, LLC
No. CV 14-14714-FDS, 2017 WL 3841468 (D. Mass. Sept. 1, 2017) .............................. 10, 20

*In-N-Out Burgers v. Doll n' Burgers LLC*
No. 20-11911, 2022 WL 791924 (E.D. Mich. Mar. 14, 2022) ................................................. 17

*Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*
No. 10 Civ. 128 (PAC), 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013)....................................... 8

*Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*
97 F. Supp. 3d 485 (S.D.N.Y. 2015)....................................................... 8

*Mark Bric Display Corp. v. Joseph Struhl Co.*
No. C.A. 98–532ML, 2003 WL 21696318 (D.R.I. July 9, 2003) ...................................... 10, 20

*McNeil-PPC, Inc. v. Merisant Co.*
No. CIV. 04-1090 (JAG), 2004 WL 3316380 (D.P.R. July 29, 2004)....................................... 20

*Nabisco v. Warner–Lambert Co.*
32 F.Supp.2d 690 (S.D.N.Y.1999)........................................................ 16

*Packgen v. Berry Plastics Corp.*
847 F.3d 80 (1st Cir. 2017)..................................................................... 2

*Parks LLC v. Tyson Foods, Inc.*
863 F.3d 220 (3rd Cir. 2017) ................................................................. 9

*Poulis-Minott v. Smith*
   388 F.3d 354 (1st Cir. 2004)...................................................................................... 3

*Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*
   954 F.2d 19 (1st Cir. 1992)........................................................................................ 3

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*
   161 F.3d 77 (1st Cir. 1998)........................................................................................ 3

*Samaan v. St. Joseph Hosp.*
   670 F.3d 21 (1st Cir. 2012)........................................................................................ 3

*Sterilite Corp. v. Olivet Int'l, Inc.*
   No. 1:22-CV-10327-JEK, 2024 WL 4349271 (D. Mass. Sept. 30, 2024)................................ 16

*Taylor v. Airco, Inc.*
   494 F. Supp. 2d 21 (D. Mass. 2007).......................................................................... 3

*United States v. Jackson*
   58 F.4th 541 (1st Cir. 2023)..................................................................................... 3

**Other Authorities**

Dec. 1, 2000 Advisory Note to Fed. R. Evid. 702 ................................................................ 3

*J. Thomas McCarthy*
   5 McCarthy on Trademarks and Unfair Competition § 32:170, at 32–275) .......................... 20

**Rules**

Fed. R. Evid. 702 ............................................................................................................ 3

## TABLE OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| Ex. A | 05/29/2024 Opening Report of Matthew G Ezell on Likelihood of Confusion (with Exhibit A) |
| Ex. B | *Men's Classic Ultra Mini*, Ugg.com (https://www.ugg.com/men-boots-classic-boots/classic-ultra-mini/1137391.html?dwvar_1137391_color=HCK) (accessed Dec. 4, 2024) |
| Ex. C | *Men*, Ugg.com (https://www.ugg.com/men/) (accessed Dec. 5, 2024) |
| Ex. D | *Shoes & Sneakers*, Ugg.com (https://www.ugg.com/men-shoes-moccasins/) (accessed Dec. 5, 2024) |
| Ex. E | *Ugg Classic Ultra Mini Womens Shoes Size 9, Color: Forest Night*, Walmart.com (https://www.walmart.com/ip/UGG-Classic-Ultra-Mini-Womens-Shoes-Size-9-Color-Forest-Night/5066479403) (accessed Dec. 5, 2024) |
| Ex. F | 10/04/2024 Deposition Transcript of Caroline de Baere |
| Ex. G | Exhibit 4 from 10/04/2024 Deposition of Caroline de Baere, *UGG DTC Consumer Profile* (DOC398-456) |
| Ex. H | 05/29/2024 Opening Expert Report of Caroline de Baere |

# I.  SUMMARY

Deckers' Motion to Exclude the Expert Opinion of Robert Griffin Wallace and supporting memorandum ("Motion") falls far short of raising issues warranting exclusion of any of Primark expert Mr. Wallace's opinions. For starters, Deckers attempts to re-write its own prosecution of this case by arguing, for the first time ever, that "the actual issue in this case" is "post-sale confusion" rather than "initial interest and/or point-of sale confusion." (Motion at pgs. 3-4.) Even if Deckers *had* made such contentions throughout the case, Mr. Wallace's surveys and related analyses are sufficient to address the alleged confusion at issue in this case. Deckers then argues that Wallace's "survey methodology contains fatal structural flaws that render his conclusions" unreliable. (*Id.* at pg. 9.) Yet, each of Deckers' complaints rely on positions that are internally inconsistent, rely on cases that are inapposite, rely on alleged facts that are nothing more than uncorroborated attorney argument, or are simply a matter of expert disagreement. In other words, at best, Deckers' complaints about Mr. Wallace's opinions are precisely the type of concerns that go to the weight of rather than the admissibility of Mr. Wallace's opinions. For the reasons set forth herein, Deckers' motion should be denied.

# II.  FACTUAL BACKGROUND[1]

On January 30, 2023, Deckers filed a suit against Primark alleging that the sale of its "Tan Faux Suede Mini Boots" infringed Deckers' unregistered trademark rights in its asserted "Classic Ultra Mini Trade Dress," U.S. Design Patent No. D927,161[2], and several state law rights. ([D.I. 1](#)

---

[1] The facts of this case have been largely reiterated in several pending motions. Primark hereby incorporates by reference its Motion for Summary Judgement ([D.I. 74](#)), Motion to Exclude the Expert Opinions of Matthew Ezell ([D.I. 67](#)) and Motion to Exclude the Expert Opinions of Caroline de Beare ([D.I. 70](#)), including any statement of facts therein.

[2] Deckers dismissed its claim for design patent infringement in July 2023. ([D.I. 31](#).)

at ¶¶19-60.)

On May 29, 2024, Primark submitted expert reports from Lenny Holden, Antonio Sarabia, and Rob Wallace supporting its claims regarding invalidity of the alleged trade dress and non-infringement. Messrs. Sarabia and Holden were retained as fashion design experts to outline the similarities and differences between the asserted Classic Ultra Mini Trade Dress and the products at issue in this case (the UGG Classic Ultra Mini shoe and Primark's Tan Faux Suede Mini shoe). Mr. Wallace was retained as a survey expert and, as such, submitted two surveys regarding the secondary meaning of the asserted Classic Ultra Mini Trade Dress and any likelihood of confusion between the asserted trade dress and Primark's Tan Faux Suede Mini shoe.

Primark subsequently submitted rebuttal expert reports of Lenny Holden, Antonio Sarabia, and Rob Wallace responding to the opinions made by Deckers' experts, Matthew Ezell and Caroline de Baere.

## III.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence dictates the admissibility of expert testimony. "A district court must 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 85 (1st Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Under First Circuit precedent, exclusion of an expert report at summary judgment is only warranted when the report's "defects are obvious on the face of [the] proffer." *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997).

"It is well-settled that trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses." *Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30 (1st Cir. 2000) (quoting *Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d

19, 20 (1st Cir. 1992) (internal quotations omitted)). The principal role of the judge is to ensure that the proposed expert witness is qualified by knowledge, skill, experience, training, or education. *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004) (citing Fed. R. Evid. 702). "Assuming this level of professional stringency is met, the evaluation of expert testimony is best left to the jury." *Taylor v. Airco, Inc.*, 494 F. Supp. 2d 21, 27 (D. Mass. 2007). As this Court has noted, *Daubert* "did not work a seachange over federal evidence law," and "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* (citing Dec. 1, 2000 Advisory Note to Fed. R. Evid. 702).

Conversely, questions regarding the strength of the facts underlying an expert's opinion, like all questions concerning weight and credibility of evidence, must be resolved by a factfinder. *See United States v. Jackson*, 58 F.4th 541, 550-51 (1st Cir. 2023). "Daubert neither requires nor empowers trial courts to determine which of several competing theories has the best provenance." *Taylor*, 494 F. Supp 2d at 27 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a *Daubert* inquiry." *Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 202 (D. Mass. 2015) (quoting *Ruiz-Troche*, 161 F.3d at 81). An expert's testimony should only be excluded if it is revealed "that there is simply too great an analytical gap between the data and the opinion proffered," *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997)).

## IV. ARGUMENT

### A. Mr. Wallace's Surveys Appropriately Tested the Likelihood of Confusion between Deckers' Alleged Trade Dress and Primark's Accused Product

Mr. Wallace created detailed surveys that appropriately test the likelihood of confusion

between Deckers' asserted trade dress and Primark's "Tan Faux Suede Mini Boots." Deckers' Motion rests on a never-before-articulated theory of the case and an ultra-narrow reading of Mr. Wallace's survey evidence. In particular, Deckers is attempting to re-prosecute its likelihood of confusion case by, for the first time, alleging that "the actual issue in this case" is "post-sale confusion…." (Motion at pgs. 3-4.)

### 1. Deckers Never Alleged That Post-Sale Confusion is the Focus of its Likelihood of Confusion Case

Despite numerous opportunities to do so, Deckers never identified "post-sale confusion" as the theory upon which its likelihood of confusion case rests. Even if it had, Mr. Wallace's surveys appropriately test for a likelihood of confusion across a variety of contexts. Any alleged concerns with Mr. Wallace's survey methodologies or results are appropriately a subject for cross-examination and not exclusion.

Deckers' Motion dedicates three pages to describing different "types of potential confusion[,]" including "Point-of-sale confusion[,]" "Post-sale confusion[,] and "Initial Interest Confusion[.]" (Motion at pgs. 3-6.) Yet, prior to the filing of its pending Motion, Deckers did not *ever* identify the type of confusion that is allegedly at issue in this case as post-sale confusion. Indeed, Deckers' Complaint is silent on what its Motion describes as the alleged "actual issue in this case." (D.I. 1, Deckers' Compl.) Similarly silent on this supposedly central aspect of Deckers' case are Deckers' initial disclosures, Deckers' interrogatory responses, and even Deckers' expert reports. In other words, the facts of this case are completely distinguishable from cases cited by Deckers for the proposition that one cannot rely strictly on surveys exclusive to point-of-sale issues when the plaintiff has made clear that the case revolves around post-sale allegations of a likelihood of confusion. Deckers simply has not done so.

Deckers cited *Gucci Am., Inc. v. Guess?, Inc.*, 831 F.Supp.2d 723, 745 (S.D.N.Y. 2011)

for the proposition that an expert report can be excluded if its survey has not properly addressed issues of post-sale confusion raised by the plaintiff's expert. (Motion at pgs. 3-4.) But, in *Gucci*, the Court explained that its rationale was based on the fact that the plaintiff specified "post-sale" confusion as its theory of the case. *Gucci Am.*, 831 F. Supp. 2d at 745. "At the August 4, 2011 hearing in this matter, Gucci made it crystal clear that it was proceeding solely on a theory of post-sale confusion." *Id.* at 739. Again, Deckers has done nothing of the sort in this case.

2.      **Mr. Wallace's Survey is Relevant to Likelihood of Confusion, including Post-Sale Confusion**

Deckers seeks exclusion of Mr. Wallace's surveys for adopting language similar to its own expert, Mr. Ezell. For example, according to Deckers' Motion, "Wallace explicitly frames his entire survey around a retail shopping context, repeatedly instructing respondents to evaluate the products 'as if you were shopping for casual shoes with the possible intent to purchase these products.'" (Motion at pg. 6.) But, the survey of Deckers' expert Mr. Ezell also queried whether the respondent has purchased boots in the past year or are likely to purchase boots in the next year and also instructed respondents to "Please look at this boot as you normally would if you were considering purchasing a pair." (Ex. A, Ezell Opening Report, Appx. A at pgs. 2-3, S4-S5, S12). Additionally, Mr. Ezell's Opening Report explains about his survey that "[t]he test cell image shows one of the Primark boots as a consumer may have encountered it when it was being sold." (Ex. A, Ezell Opening Report at ¶19 (emphasis added).) In other words, any daylight between the two experts' instructions on the context in this regard is a distinction without a difference.

Deckers' Motion also posits that Mr. Wallace's alleged use of a "comparison shopping experience" is further evidence that his surveys impermissibly target only the retail shopping context. Not so. As described above, the instructions for the initial viewing by Mr. Wallace are similar to the instructions by Mr. Ezell – "shopping for casual shoes with the possible intent to

purchase" versus "look at this boot as you normally would if you were considering purchasing a pair." Deckers criticizes Mr. Wallace's "sequential presentation" insofar as his survey instructs, "Later you come across this product[.]" (Motion at pgs. 6-7.) Again, the recent-or-potential-purchaser context of Mr. Wallace's survey is the same context as Mr. Ezell's context. Self-evidently, the respondent will see the products at different points in time. Deckers points to no law that stands for the proposition that suggesting that one product is viewed later than another product is "a classic test for initial interest confusion…" as Deckers argues. Additionally, the Wallace quote identified by Deckers does not specify that the product is later seen *at the point of sale*.

Deckers' citation to the *Gucci* case is unavailing insofar as the court in *Gucci* relied on the fact that the plaintiff in that case, *unlike Deckers in the present case*, "made it crystal clear that it was proceeding solely on a theory of post-sale confusion." *Gucci Am.*, 831 F. Supp. 2d at 739. Also in that case, "[the Defendant] does not dispute that the Helfgott Surveys were conducted with the purpose of measuring point-of-sale confusion." *Id.* at 745. That is decidedly not the case here, where Mr. Wallace testified as follows:

> Q. And are you familiar with initial interest, point-of-sale, and post sale confusion, those concepts?
> A. Yes.
> Q. And your likelihood of confusion survey only tests point of sale. Correct?
> A. No.
> …
> Q. So you test -- you tested post sale confusion?
> A. Yes, both presale, post-sale and point-of-purchase confusion.

(Addendum to Deckers' Motion (D.I. 76), CM/ECF pgs. 1-53 (hereinafter "Wallace Dep. Tr." [3]) at 52:1-7, 52:13-16.) Deckers never contended that this case is about post-sale confusion, much

---

[3] With its Motion, Deckers filed an appendix (D.I. 76), which contains the Deposition Transcript of Rob Wallace (CM/ECF pgs. 1-53), Mr. Wallace's Opening Expert Report (CM/ECF pgs. 54-104), and Mr. Wallace's Rebuttal Report (CM/ECF pgs. 105-150). For ease, any reference to these documents can be found in the Appendix/Exhibit filed by Deckers.

less *exclusively* about it, until its pending motion. Further, Mr. Wallace's surveys are applicable to the confusion test across a broad range of contexts, as he testified.

Deckers also argues that Wallace's Survey Two "doubles down on this retail focus by placing the products in an explicit retail context, instructing respondents to 'consider the context as to where you would see this product for sale' and showing pictures of retail environments." (Motion at pgs. 7-8 (quoting Wallace Survey Two, Q13a and Q13b).) But, Deckers ignores the series of questions that precede the quoted questions. Those questions ask about the source of the product without any reference to a retail setting. In particular, the preceding questions ask respondents the following:

10a. Please review the following images as if you were shopping for casual shoes with the possible intent to purchase these products.

Based on the look and design of this product, do you believe that this shoe comes from one brand or source Or is it a generic design that is used by different casual shoe brands/ sources?

   

11a. Based on its look, what do you believe this product's brand name might be? In other words, what is the source that you associate with making this shoe?

12a. Why do you say that?

(Addendum to Deckers' Motion (D.I. 76), CM/ECF pgs. 98-104 (hereinafter "Wallace Survey Two") at Q10a-12a.) In other words, the respondent is asked about the source of the product prior to any store identification. In the instance of both the Primark and the Deckers shoes, the respondents are first asked about the source of the shoes, that are shown in isolation, prior to being asked the question again after a retailer is identified. This addresses Deckers' argument that the

Ezell survey does not suffer from the same issues because it "showed products in isolation as they would be encountered in post-sale contexts…." (Motion at pg. 7.) In essence, Deckers complains about Wallace *ever* asking about the retail context, which is unsupported by any case cited by Deckers or found by the undersigned.

For the foregoing reasons, Deckers is incorrect that Mr. Wallace's surveys are limited to inquiries that are "explicitly tied to a retail or shopping context." (*See* Motion at pg. 8.) For similar reasons, Deckers is incorrect that Mr. Wallace's resulting conclusions about the percentage of respondents finding a likelihood of confusion are flawed. However, to the extent that Deckers truly believes its case is exclusively about post-sale confusion and that Mr. Wallace failed to address a likelihood of confusion in the post-sale context, any such dispute should go to the weight rather than the admissibility of Mr. Wallace's surveys, opinions and proposed testimony related thereto. *See, e.g., Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 127 (S.D.N.Y. 2022) (denying a motion to exclude survey testimony, finding "[t]hat the survey did not test post-sale encounters with the products goes to its weight, not its admissibility."); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015) (quoting *Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775437, at *16 (S.D.N.Y. Apr. 25, 2013)) (denying motion to exclude damages expert, finding, "[t]o the extent that Defendants' believe Mulhern's conclusions do not hold in the post-sale context, their objections 'may be properly explored on cross-examination and go to [the] testimony's weight and credibility—not its admissibility.'").

### B. Mr. Wallace's Survey Methodology is Fundamentally Sound and Reliable

Next, Deckers argues that alleged errors in Mr. Wallace's survey methodologies warrant exclusion of his surveys. (Motion at pg. 9.) Wallace used survey methodologies that are widely

accepted in trademark infringement cases. He summarized the primary surveys that he commissioned, including as follows:

> 2. I was asked to conduct two empirical, court-compliant surveys designed to determine the relevant consuming public's perception of the issues at hand in this case. The first survey conducted for this case (Exhibit A – DeckersvPrimarkSec Meaning/LOCSurvey 4_17_23) determined if the relevant consuming public believes that the Ugg shoe trade dress has acquired distinctiveness or secondary meaning in that its trade dress is associated with a unique source or is perceived as being generic. This survey also determined if there is relevant likelihood of confusion between the two products in question in that they are perceived to come from the same source or affiliated sources based on their individual trade dress.

> 3. The second survey conducted (Exhibit B – DeckersvPrimarkSecMeaning/LOCsurvey 05-16_23) placed the products in question in the context of the retail environment where consumers often engage these products. This survey then asked secondary meaning and source identifying questions of the products in question in the context of one of the retail environments where these products are sold.

(Addendum to Deckers' Motion ([D.I. 76](#)), CM/ECF pgs. 54-86 (hereinafter "Wallace Report") at ¶¶2-3.)

## 1. Mr. Wallace's Survey Design is Proper

Deckers asserts that Mr. Wallace's methodology improperly employs a so-called "form of a *Squirt* survey – a format where product are placed side-by-side, along with controls, 'and participants are asked questions to determine if confusion exists as to the source of the products.'" (Motion at pg. 11 (quoting *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 233 (3rd Cir. 2017)).) According to Deckers, "Wallace failed to sufficiently approximate the manner in which consumers encountered the parties' products in the marketplace." (*Id.*)

First, as described above, Wallace's surveys appropriately inquired about the source of both the Primark and the Deckers shoes in isolation prior to asking about the shoes with reference to one another. Further, Deckers cannot credibly argue that people searching for shoes would not look at a variety of different types in short succession. Finally, Deckers' assertion that courts

"prohibit placing trademarks side-by-side in a survey if doing so would create an artificial situation that does not reflect that marketplace, as Wallace did here[]" injects a false premise. (Motion at pg. 11 (citations omitted).) Mr. Wallace's surveys do not "place trademarks side-by-side in a survey" at all. Rather, as described, Mr. Wallace's surveys ask about the source of the products in isolation. Deckers notably did not include the purportedly objectionable presentation of the marks in its brief as the images did not support their false premise. As noted by Deckers, errors in survey methodology usually go to the weight of the evidence (Motion at pg. 9.) Indeed, although Mr. Wallace's methods are appropriate, even the use of unconventional methods in surveys does not render them inadmissible and instead should go to the weight afforded to such surveys. *See Hilsinger Co. v. Kleen Concepts, LLC*, No. CV-14-14714-FDS, 2017 WL 3841468, at *11 (D. Mass. Sept. 1, 2017) ("Plaintiff further objects to the opinion of Sowers because of his use of what it contends are unconventional methods, including the imposition of a five-second delay between the display of each product. However, the concerns that plaintiff cites go to the weight of the evidence, rather than its admissibility, and are best left for exploration on cross-examination."). "[T]he majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence." *Mark Bric Display Corp. v. Joseph Struhl Co.*, No. C.A. 98–532ML, 2003 WL 21696318, at *9 (D.R.I. July 9, 2003) (quoting 5 *McCarthy on Trademarks and Unfair Competition* § 32:170)).

### 2.    Mr. Wallace's Survey "Universe" is Appropriate

According to Deckers, the universe selected for Mr. Wallace's survey is overly broad and therefore improper. In particular, Deckers takes issue with Mr. Wallace's "defined universe" of "anyone between 18-65 [sic] who has or are planning on purchasing casual shoes." (Motion at pg. 13 (emphasis removed).) Relying exclusively on attorney argument, Deckers argues that "both the

UGG Classic Ultra Mini and Accused Product are boots sold almost exclusively to women." (*Id.*) Setting aside the impropriety of relying on such an evidence-free assertion, the statement is also counterfactual based on UGG's own marketing and the testimony of Deckers' experts. A cursory search of Google directed the undersigned to UGG's own website at ugg.com. UGG's website identifies the "*Men's* Classic Ultra Mini" as a "Best Seller."



(*See* Ex. B, *Men's Classic Ultra Mini*, Ugg.Com (https://www.ugg.com/men-boots-classic-boots/classic-ultra-mini/1137391.html?dwvar_1137391_color=HCK) (last visited Dec. 9, 2024).) In fact, going directly to UGG's website and then navigating to Men's products by clicking on "Men" at the top of the home page takes you directly to a number of featured *men's* products, one of which is the "Classic Ultra Mini." (*Id.*)



(*See* Ex. C, *Men*, Ugg.com ([https://www.ugg.com/men/](https://www.ugg.com/men/)) (last visited Dec. 9, 2024).) Upon clicking the link for the product, a number of images appear, including one image with a man wearing the "Classic Ultra Mini" product.



(*See* Ex. B.) UGG's website's assertion that its "Men's Classic Ultra Mini" is a "Best Seller" belies Deckers' attorney argument that such products are "sold almost exclusively to women."

Deckers' own internal documents establish that men are an important segment of a proper survey universe. ████████████████████████████████████

████████████████████████████████████████████████████



Accordingly, men must be included in the group of consumers whose state of mind is relevant to assessing whether the asserted trade dress has secondary meaning and whether there is a likelihood of confusion. It is Deckers' exclusion of men from its own surveys that is improper and makes their own universe of respondents unduly narrow.

Deckers also argues that Mr. Wallace's description of the universe as one of "casual shoes" is overly broad, but again this is belied by UGG's own marketing of its footwear as "shoes and sneakers" even when that footwear looks more boot-like – including those with a higher shaft height – than do the Classic Ultra Minis:



*Weather Rated -20°C*
**Neumel TrailGazer** ♡
$180  | 2 Colors

*Best Seller*
**Neumel Weather Hybrid** ♡
$180  | 2 Colors

---



(Ex. D, *Shoes & Sneakers*, Ugg.com (https://www.ugg.com/men-shoes-moccasins/) (last visited Dec. 9, 2024).) Indeed, at least UGG's Neumel TrailGazer, Neumel Weather Hybrid, the UGG Lug Chukka, the Hayden Moc, and the Burleigh Chukka have shaft heights higher than or comparable to the Classic Ultra Mini and are categorized among UGG's "shoes and sneakers."



(*See* Ex. B.) A cursory glance at the Classic Ultra Mini could leave one to wonder whether it is a slipper, a moccasin, or a very low cut boot, all of which are appropriately described as "casual

shoes." If anything, Deckers' suggestion of limiting the universe to "boots" for "women" would improperly omit a number of very similar-type products, including the ones identified above.

Deckers itself has identified that consumers associate the term "casual" with UGG products. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████

███████████████████████████████████████████

(Ex. H, 05/29/2024 Opening Expert Report of Caroline de Baere, pg. 24 (citing Deckers Doc 814)).

Accordingly, Mr. Wallace's universe of survey respondents was entirely appropriate to test the questions at issue in this case, namely secondary meaning and likelihood confusion, particularly when compared to Mr. Ezell's overly narrow universe of women-only and recent or potential buyers of boots only. Any issues with Mr. Wallace's universe of respondents is best dealt with through cross-examination and not exclusion.

### 3. Mr. Wallace's Selected Control is Appropriate

Deckers' next argument is that Mr. Wallace's "control falls for [sic] short of propriety by

retaining *all* of the claimed features of the UGG Classic Ultra Mini Trade Dress." (Motion at pg. 15.) This is flatly incorrect. Although Deckers correctly notes that "A control product is one that is a non-infringing product which is similar to the products at issue[,]" they completely ignore this requirement by selecting entirely dissimilar products as their own control, whereas Mr. Wallace selected a control that is both similar and yet non-infringing. (Motion at pg. 15 (quoting *Nabisco v. Warner–Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999)).)

Mr. Wallace explained in his report, "The control stimuli compared the shoes in question and a different casual shoe that was as similar to but not identical with the products in question." (Wallace Report at ¶29.) In addition, Mr. Wallace elaborates on at least one of the missing elements of the alleged trade dress from the control product. Regarding that element, "An exaggerated, raised and exposed circular stich pattern," Mr. Wallace opined, "As indicated in the imagery below, the Primark boot does not have this distinctive stitch pattern, and therefore, in my professional opinion, it does not infringe on this feature, nor does the control stimulus used for my survey." (Addendum to Deckers' Motion (D.I. 76), CM/ECF pgs. 105-150 (hereinafter "Wallace Rebuttal"), at ¶5c.) Regarding the control stimuli, Mr. Wallace further explained during his deposition, "I don't believe that this shoe has an exaggerated stitching pattern. The stitching pattern is not raised or circular. And so, it looks very similar, but it doesn't have that particular element." (Wallace Dep. Tr., at 65:10-15.) In other words, Mr. Wallace properly selected a control product that is similar, but is non-infringing for at least the reason stated above. Further, any objections with Mr. Wallace's control go to the weight rather than the admissibility of his selection. *Sterilite Corp. v. Olivet Int'l, Inc.*, No. 1:22-CV-10327-JEK, 2024 WL 4349271, at *9 (D. Mass. Sept. 30, 2024) ("[E]ven accepting Sterilite's criticisms of the control group images (which Olivet contests), its objections go to weight rather than admissibility."); *see also GeigTech E. Bay LLC v. Lutron*

*Elecs. Co.*, No. 18-cv-5290-CM, 2023 WL 6614486, at *17 (S.D.N.Y. Sept. 20, 2023) ("Any issues with the control stimuli ... go only to weight but do not merit exclusion."); *In-N-Out Burgers v. Doll n' Burgers LLC*, No. 20-11911, 2022 WL 791924, at *7 (E.D. Mich. Mar. 14, 2022) (not excluding survey "[b]ecause the control images are not blatantly inappropriate" and "[t]he factfinder ... can judge the degree of bias these images may have introduced").

Mr. Wallace properly selected a control that was similar to, but did not infringe, Deckers' alleged trade dress. To the extent that Deckers disagrees with his selection of a control, such dispute is best dealt with through cross-examination rather than exclusion.

### 4.     Mr. Wallace Created an Appropriate Context for His Surveys

According to Deckers' Motion, "Wallace fatally compromised his survey's reliability by creating a false marketplace context that artificially deflated confusion levels." (Motion at pg. 16.) First, Deckers argues that Wallace "compromised his survey's validity by repeatedly presenting photographs emphasizing the soles of the boots – a perspective that emphasizes an element not claimed as part of the trade dress and fails to replicate real-world post-sale confusion conditions." (*Id.*) Deckers' argument is unconvincing for a number of reasons. As an initial matter, once again, Deckers makes the unsupported argument that it made this a case about post-sale confusion. For the reasons set forth above, they did not so limit their case. Additionally, UGG's own website displays images of the Classic Ultra Mini that include images showing the soles of the product, indicating that it is something that a recent or prospective buyer might consider, at least in Deckers' estimation. (*See* Ex. B.)

Moreover, the objected to image showing the soles of the shoes was displayed along with several other images showing apparently non-objectionable angles of the product. Therefore, Deckers' argument is unavailing and they cite no case law that suggests the inclusion of images

that show portions of unclaimed trade dress elements are objectionable. Further, Mr. Wallace covered up any source-identifying marks on the rear of the shoe as well as on the sole.

Contrary to Deckers' assertions, Mr. Wallace did not "fixat[e] on irrelevant features invisible in post-sale encounters[,]" but rather identified several images of the products at issue with a particular emphasis on the portions of the shoes with claimed features. (Motion at pg. 17.) Also, contrary to Deckers' assertion that the soles of the shoes "would never be visible in actual post-sale encounters[,]" the bottoms of shoes and boots are regularly seen in people walking, running, sitting (especially with legs crossed), or while lying on a floor, as just a few of the many examples of such natural encounters. (*Id.*) Therefore, Deckers' argument fails.

Deckers next argues that question 13a of Mr. Wallace's survey is improper insofar as it indicates *where* the accused product is sold. (Motion at pg. 18.) But, Deckers cites no case law or other authority that stands for the proposition that such information is objectionable. In fact, question 13a asks, "Based on the look of the shoe and the retail experience where it is sold, what do you believe this product's brand name might be? In other words, what is the source that you associate with making this shoe?" (Wallace Survey Two, Ex. B at 13a.) This question is open and does not in any way suggest the answer. It is entirely appropriate.

Finally, Deckers argues, "[i]n an apparent attempt to suppress the level of secondary meaning for the UGG product in question, Mr. Wallace provided respondents in Wallace Survey Two (Ex. B.) with a *false* retail context. Specifically, he represented to his survey respondents that the UGG product they were seeing were sold in Walmart retail stores, when they are not." (Motion at pgs. 18-19 (quoting Ezell Rebuttal Report at ¶14) (emphasis in original).) First, the products are in fact available from Walmart.



(Ex. E, *Ugg Classic Ultra Mini Womens Shoes Size 9, Color: Forest Night*, Walmart.com (https://www.walmart.com/ip/UGG-Classic-Ultra-Mini-Womens-Shoes-Size-9-Color-Forest-Night/5066479403) (last visited Dec. 9, 2024).) As Mr. Wallace testified, he "bought [the UGG Classic Ultra Mini Shoe] on Walmart.com and picked it up at a Walmart store." (Wallace Dep. Tr., at 132:4-13.) Moreover, this is a distinction without a difference for the purpose of Mr. Wallace's survey. The mention of Walmart was simply a description of a company from which a potential buyer might be able to purchase the product. That remains correct. Deckers' argument that "[t]his false context materially affected respondents' answers, and destroys the validity of the study, as demonstrated by a mere sampling of participants own answers…" is also unconvincing. (Motion at pg. 19.) The implication suggested by Deckers is that participants believed that UGG would never be affiliated with or have their products sold by Walmart, something we know is incorrect as shown in the example above from Walmart's website. Therefore, Mr. Wallace's survey is accurate for relevant purposes. At worst, the minor discrepancy between whether the products are sold in Walmart stores or on Walmart.com is harmless and goes to weight rather than admissibility. *McNeil-PPC, Inc. v. Merisant Co.*, No. CIV. 04-1090 (JAG), 2004 WL 3316380 (D.P.R. July 29,

2004) "[T]he majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence." *Mark Bric Display*, No. C.A. 98–532ML, 2003 WL 21696318, at *9 (quoting 5 *McCarthy on Trademarks and Unfair Competition* § 32:170). Once again, the best way to deal with Deckers' objections to Mr. Wallace's survey is through cross-examination and not by exclusion.

### C.    Exclusion Under Rule 403 Is Not Proper In This Case

For all of the reasons set forth herein, Mr. Wallace's various opinions and surveys are appropriately tailored to the facts of this case. Deckers has fallen far short of demonstrating that the concerns it cites cause the probative value of Wallace's survey to be substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403; *see also Hilsinger Co.*, 2017 WL 3841468, *11 (finding that "plaintiff has not demonstrate that the concerns it cites cause the probative value of Sowers's survey to be substantially outweighed by the danger of unfair prejudice."). In fact, Deckers does not set forth any specific arguments in the context of Rule 403. Regardless, the probative value of Mr. Wallace's survey evidence outweighs any potential danger of unfair prejudice. As such, Deckers' motion should be denied.

### V.    CONCLUSION

For the foregoing reasons, Deckers' motion should be denied.

Dated: December 9, 2024          By:   /s/ *Ronald A. DiCerbo*

Ronald A. DiCerbo (admitted *pro hac vice)*
Christopher V. Carani (admitted *pro hac vice)*
**McAndrews Held & Malloy, Ltd.**
500 West Madison Street, 34th Floor
Chicago, IL 60661
Phone: (312) 775-8000
Email: RDiCerbo@mcandrews-ip.com
         CCarani@mcandrews-ip.com

Philip C. Swain
**Law Office of Philip Swain, LLC**
114 Pine Hill Lane
Concord, MA  01742
Phone: (617) 365-4844
Email: pcs@philswainlaw.com

*Attorneys for Defendant Primark US Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system, and by electronic mail (Email) and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF.)

*/s/ Ronald A. DiCerbo*
Ronald A. DiCerbo
