UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DECKERS OUTDOOR CORPORATION, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 1:23-cv-10233-ADB |
| | * | |
| PRIMARK US CORP., | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

      Plaintiff Deckers Outdoor Corporation ("Deckers" or "Plaintiff") initiated this action alleging trade dress infringement, unfair and deceptive trade practices, and unfair competition against Defendant Primark US Corp. ("Primark" or "Defendant"). [ECF No. 1 ("Compl." or "Complaint")].[1] Currently pending before the Court is Defendant's motion for summary judgment. [ECF No. 73]. The Court concurrently is considering both parties' motions in limine to exclude expert testimony. [ECF Nos. 66, 68, 69, 71, 72]. For the reasons set forth below, all of the motions in limine are **DENIED**, except with regard to Caroline de Baere and Antonio Sarabia, [ECF Nos. 68 and 71] which are **GRANTED** in part and **DENIED** in part, and Defendant's motion for summary judgment is **DENIED**.

---

[1] Plaintiffs originally brought a patent infringement claim under 35 U.S.C. § 271, [Compl. ¶¶ 53–60], but the parties stipulated to its dismissal on July 14, 2023. [ECF No. 31].

# I.    BACKGROUND

## A.  Material Facts[2]

Plaintiff is a footwear company that has been designing and selling footwear since 1975. [ECF No. 90 ¶ 52].  Plaintiff is the maker of the UGG® Classic Ultra Mini shoe, which was first introduced for sale in the United States in July 2020.  [ECF No. 90 ¶¶ 5, 23].  This shoe is typically sold at retail for approximately $150 per unit.  [ECF No. 90 ¶ 78].

Defendant is an Irish company that operates Primark stores globally, including twenty-four stores in the United States.  [ECF No. 104 ¶ 81].  Primark stores only sell Primark products. [ECF No. 90 ¶ 44].  Included among these is the Primark Tan Faux Suede Mini Boot.  [ECF No. 90 ¶ 6].  This shoe was first sold in the United States in August 2021, [ECF No. 90 ¶ 35], and was sold in all of Primark's United States stores, [ECF No. 104 ¶ 83].

## B.  Procedural History

On January 30, 2023, Plaintiff brought suit against Defendant for trade dress infringement, unfair competition, and patent infringement on the basis that the Primark Tan Faux Suede Mini Boot infringed on the UGG® Classic Ultra Mini Trade Dress ("Classic Ultra Mini Trade Dress" or "Asserted Trade Dress").  [ECF No. 90 ¶¶ 1–3; see generally Compl.].  The Asserted Trade Dress is alleged to have the following elements:

    a. An ankle-high boot;
    b. Classic suede boot styling;
    c. An exaggerated, raised and exposed circular stitch pattern;
    d. Exposed tufting;
    e. A raised and rounded vamp;
    f. A suede heel overlay on the boots exterior;

---

[2] The Court draws the facts, unless otherwise stated, from the parties' combined Rule 56.1 statements of facts, which are (1) Plaintiff's responses to Defendant's Statement of Material Facts [ECF No. 90] and (2) Defendant's responses to Plaintiff's Statement of Additional Facts, [ECF No. 104], as well as documents referenced therein and, where necessary, the record.

g. Fabric binding along the top of the boot and along the sole;

h. A thick, flat sole; and

i. A top line that is higher in the front and lower in the back.

[ECF No. 90 ¶ 3]. Moreover, Plaintiff alleges that the trade dress embodied the UGG Classic

Ultra Mini boot, as displayed in the following images:

 

[Compl. ¶ 21]. Defendant filed an answer and counterclaims on April 7, 2023. [ECF No. 15].

Plaintiff's motion to strike Defendant's affirmative defenses and dismiss its counterclaims was

filed on April 28, 2023, [ECF No. 26] and denied on December 7, 2023. [ECF No. 41]. The

parties stipulated to dismissal of the patent infringement claim on July 14, 2023. [ECF No. 31].

Plaintiff filed an answer to Defendant's counterclaims on April 1, 2024. [ECF No. 45]. On

September 4, 2024, Defendant moved for summary judgment and filed two motions in limine to

exclude Plaintiff's expert witnesses. [ECF Nos. 55, 57, 59]. Defendant withdrew these motions

[ECF No. 65], and refiled them on November 4, 2024, [ECF Nos. 66, 68, 73]. On the same day,

Plaintiff filed three motions in limine to exclude Defendant's experts. [ECF Nos. 69, 71, 72].

Plaintiff opposed summary judgment and the exclusion of its experts, [ECF Nos. 87, 89], and

Defendant opposed the exclusion of its experts on December 9, 2024, [ECF Nos. 84, 85, 86].

Defendant filed a reply to Plaintiff's opposition to summary judgment on December 23, 2024.

[ECF No. 103]. Plaintiff filed an omnibus reply to Defendant's opposition to the exclusion of

their experts on December 31, 2024, [ECF No. 113], and Defendant filed replies to Plaintiff's

opposition to the exclusion of their experts on January 3, 2025, [ECF Nos. 120, 121].

## II.    LEGAL STANDARD

### A.  Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  Federal Rule of Evidence 702

provides that a person

> who is qualified as an expert by knowledge, skill, experience, training, or education
> may testify in the form of an opinion or otherwise if[:]
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the
>       trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert's opinion reflects a reliable application of the principles and methods
>       to the facts of the case.

Fed. R. Evid. 702.

"Under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509

U.S. 579, 113 S.Ct. 2786, 125 L. Ed. 2d 469 (1993), trial judges must act as gatekeeper to

'insur[e] that the fact-finding process does not become distorted by expertise that is fausse and

science that is junky.'"  Neural Magic, Inc. v. Meta Platforms, Inc., 659 F. Supp. 3d 138, 152 (D.

Mass. 2023) (alterations in original) (internal quotation marks omitted) (quoting Fed. Ins. Co. v.

Pentair Residential Filtration, LLC, No. 12-cv-10853, 2013 WL 6145531, at *3 (D. Mass. Nov.

21, 2013)).  "[J]udge[s] must . . . determine whether the witness is sufficiently qualified by

'knowledge, skill, experience, training, or education' to give his proffered opinion."  Id. (quoting

Fed. Ins. Co., 2013 WL 6145531, at *3).  "If the witness is deemed qualified, the judge must

next determine whether the specific testimony offered in the case 'both rests on a reliable foundation and is relevant to the task at hand.'" Id. (quoting In re Nexium (Esomeprazole) Antitrust Litig., 842 F.3d 34, 52 (1st Cir. 2016)). "The reliable foundation requirement necessitates an inquiry into the methodology and the basis for an expert's opinion." Id. (quoting Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 (1st Cir. 2012). "The relevancy requirement 'seeks to ensure that there is an adequate fit between the expert's methods and his conclusions' by determining whether the expert's conclusions 'flow rationally from the methodology employed.'" Id. (quoting Samaan, 670 F.3d at 32). "[A] court may exclude an expert's opinion when it is based upon conjecture or speculation deriving from an insufficient evidentiary source." E.E.O.C. v. Tex. Roadhouse, Inc., 215 F. Supp. 3d 140, 158 (D. Mass. 2016).

"A trial setting normally will provide the best operating environment for the triage which Daubert demands. . . . [G]iven the complex factual inquiry required by Daubert, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that Daubert imposes, the Daubert regime should be employed only with great care and circumspection at the summary judgment stage." Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 188 (1st Cir. 1997).

### B. Summary Judgment

Summary judgment is appropriate where the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).

5

The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). Instead, "[t]he factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran, 328 F.3d at 6. "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id.

Thus, "[t]o succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . [that] demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). The moving party may also point to the "absence of evidence to support" an essential element of "the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Id. at 323–24. "Once the movant takes [the] position" that "the record before the court fails to make out a trialworthy question of material fact," it becomes "the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

6

### C. Trade Dress

Plaintiff seeks relief under the Lanham Act § 43(a), which states:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) & (B). "To establish a claim for infringement of an unregistered mark under section 43(a) of the Lanham Act, [a plaintiff] 'must demonstrate both that its mark merits protection and that the allegedly infringing use is likely to result in consumer confusion.'" Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc., No. 10-cv-10742, 2011 WL 6812642, at *3 (D. Mass. Dec. 28, 2011) (quoting Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 116 (1st Cir. 2006)).

The Supreme Court has extended § 43(a) protection to "trade dress." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 770–71 (1992). "Trade dress has been defined as 'the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer.'" Chrysler Corp. v. Silva, 118 F.3d 56, 58 (1st Cir. 1997) (quoting Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997) (alteration in original)). To establish trade dress infringement specifically, "a plaintiff must demonstrate that (1) the trade dress has been used in commerce, (2) the trade dress is nonfunctional, (3) the trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning, and (4) that prospective purchasers of the products in question are likely to

be confused as to the source of the products." Annalee Mobilitee Dolls, Inc. v. Townsend Design Studios, Inc., No. 03-cv-00327, 2003 WL 22901680, at *9 (D.N.H. Dec. 9, 2003).

State law claims are largely evaluated under the same analysis as the Lanham Act claim. Birkenstock US BidCo, Inc. v. White Mountain Int'l LLC, 747 F. Supp. 3d 292, 303 (D. Mass. 2024) ("[T]he standard for a trade dress claim under Massachusetts common law is indistinguishable from the Lanham Act claims." (internal quotations and alterations omitted)); Santander Consumer USA Inc. v. Walsh, 762 F. Supp. 2d 217, 225 (D. Mass. 2010) ("The same likelihood of confusion standard applies to the unfair competition . . . claim[].")); Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 61 n.6 (1st Cir. 2008) ("Venture's unfair competition claim . . . [is] subject to the same legal standard—namely, 'likelihood of confusion'—as its Count 1 infringement claim"); FabriClear, LLC v. Harvest Direct, LLC, 651 F. Supp. 3d 406, 412 (D. Mass. 2023), reconsideration denied, No. 20-cv-10580, 2023 WL 2407401 (D. Mass. Feb. 6, 2023), appeal docketed, No. 25-1081 (1st Cir. Jan. 23, 2025) (granting summary judgment on 93A claim "[f]or similar reasons" as the Lanham Act claim where the 93A claim was "premised on the same theory as its federal Lanham Act claim").

## III.    DISCUSSION

Defendant moves for summary judgment on all counts asserted in the Complaint including federal trade dress infringement (Count I), common law trade dress infringement (Count II), unfair and deceptive trade practices (Count III), and unfair competition (Count IV). See generally [ECF Nos. 73, 74]. To address this motion, the Court must first turn to the Daubert motions. See Facey v. Dickhaut, 91 F. Supp. 3d 12, 21 (D. Mass. 2014) ("There are two other pending motions that affect the information the court may consider in deciding the motion

for summary judgment.  Therefore, they are being decided before the court addresses the motion for summary judgment.").

### A.    Admissibility of Experts

At issue is the admissibility of the testimony of five different experts: Plaintiff's experts Matthew G. Ezell and Caroline de Baere, and Defendant's experts Lenny Holden, Antonio R. Sarabia II, and Robert Griffin Wallace, Jr.  See [ECF Nos. 66, 68, 69, 71, 72].

### 1.    Matthew G. Ezell

Plaintiff submitted the expert report of Matthew G. Ezell ("Ezell"), which primarily rests on two consumer surveys intended to establish the "secondary meaning" and "likelihood of confusion" regarding the UGG Classic Ultra Mini Trade Dress.  See generally [ECF No. 67-1]. Ezell provides marketing consulting and research services, and has worked on trademark and trade dress matters for approximately 23 years.  [Id. ¶ 21].

Defendant argues for exclusion solely on the basis of the surveys themselves, rather than Ezell's qualifications: specifically, that the surveys do not represent the proper survey universe, that the methodologies of the surveys are flawed and unreliable, and that the secondary meaning survey does not focus on the relevant timeframe.  [ECF No. 67 at 10].  Plaintiff counters that the methods were reliable, the survey universes were appropriate, and the secondary meaning survey is focused on the appropriate time frame.  [ECF No. 92 at 8–24].

The secondary meaning survey consisted of 400 interviews of females 18 years of age and over "who had either purchased a pair of boots for casual wear in the past year, or were likely to purchase a pair of boots for casual wear in the next year."  [ECF No. 67-1 ¶¶ 4, 12]. The survey used an experimental design consisting of two survey cells, a "test" cell and a "control" cell.  [Id. ¶ 13].  The test cell was purportedly designed to measure the secondary

meaning of the appearance of the UGG Classic Ultra Mini boot.  [Id.]  The control cell, by contrast, was designed to measure the extent of potential mismeasurement error in the survey results.  [Id.]  The test cell image was of the UGG Classic Ultra Mini.  [Id. ¶ 5].  The control cell image was a different boot that did not contain elements of the Classic Ultra Mini trade dress. [Id.]  Ezell's survey found that 73% of the "relevant universe" associate the appearance of the Classic Ultra Mini boot with UGG or a single anonymous source.  [Id. ¶ 19].

Defendant has several critiques of Ezell's secondary meaning survey.  [ECF No. 67]. Specifically, it argues that each of the following flaws rigged the results in favor of Deckers, [id. at 21–25]: (1) the survey population was improperly narrowed because it excluded men, [id. at 11–12]; (2) the secondary meaning survey improperly tested the time period after infringement, [id. at 14–15]; (3) the survey did not test the asserted trade dress, which it purports does not match the actual Classic Ultra Mini boot,[3] [id. at 15–18]; (4) the survey improperly limits whether individuals were able to associate the test image with more than one brand, [id. at 18– 21].

The likelihood of confusion survey used the same survey universe as the secondary meaning survey, and had 400 participants.  See [ECF No. 67-2 ¶ 15].  It used the so-called Ever-

---

[3] The argument that the Classic Ultra Mini Trade Dress does not describe the UGG Classic Mini Ultra boot permeates Defendant's briefing on all the motions at issue.  With regard to the testimony of Ezell, this issue ultimately goes to the relevance of the surveys, rather than their methodology.  If the Trade Dress does not embody the UGG Classic Ultra Mini boot, then surveys testing the secondary meaning and likelihood of confusion of the boot would not be relevant to the validity of the Trade Dress, even if conducted according to appropriate standards. And, as discussed infra, this is also a dispositive issue on Defendant's liability, because Defendant cannot be liable if the jury finds that the Trade Dress does not describe the product at issue as the first requirement of a Trade Dress claim is that the asserted trade dress describes a product in commerce.  See Annalee Mobilitee Dolls, Inc., 2003 WL 22901680, at *9.  The Court will therefore allow the testimony as conditionally relevant.

<u>Ready</u> survey methodology,[4] which also consisted of the test and control cells.  [<u>Id.</u> ¶¶ 11, 24]. The test cell was designed to "measure the degree, if any, to which consumers are likely to be confused by the mistaken belief that Defendant's Primark boots are sold by, have the authorization or approval of, or have a business affiliation or business connection with Plaintiff." [<u>Id.</u> ¶ 10].  It first asked participants who they believed the manufacturer of the boots was and why.  [<u>Id.</u> ¶ 20].  It then asked what other brands make the boots and why.  [<u>Id.</u> ¶ 21].  Survey Respondents were asked "whether they believed that whoever makes or puts out the boot shown has the authorization or approval of any other company(s) or brand(s), and if so, what company(s) or brand(s)" and why.  [<u>Id.</u> ¶ 22].  Finally, survey respondents were asked "whether they believed that whoever makes or puts out the boot shown has a business affiliation or business connection with any other company(s) or brand(s), and, if so, with what company(s) or brand(s)" and why.  [<u>Id.</u> ¶ 23].

Defendant likewise raised several issues with Ezell's likelihood of confusion survey.  It again argues that the universe of respondents was incorrectly limited.  [ECF No. 67 at 10]. Moreover, it argues that the survey improperly limited respondents to selecting one manufacturer, rather than allowing them to identify multiple brands that they associate with the image, therefore assuming that a respondent who names only a single source in response to a product only associates a single source with that product.  [<u>Id.</u> at 22].  Finally, it argues that the survey did not establish why a respondent would identify UGG as the brand source.  [<u>Id.</u> at 25].

---

[4] This is a survey method that comes from <u>Union Carbide Corp. v. Ever-Ready Inc.</u>, 531 F.2d 366, 387 (7th Cir. 1976) and involves a particular series of questions asked to ascertain likelihood of confusion.  5 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.). "The Eveready survey format is widely regarded as an appropriate method of testing for likelihood of confusion."  <u>Id.</u>

Ultimately, Defendant concludes that, as with the secondary meaning survey, these problems tilted the balance of the survey in favor of Deckers and therefore skewed the statistical results. [Id.]

The Court disagrees with the Defendant that the methodological issues raised, merit the exclusion of Ezell's surveys. As the Court has stated, "[a] trial setting normally will provide the best operating environment for the triage which Daubert demands." Cortés-Irizarry, 111 F.3d at 188. More specifically, even assuming the validity of all of the methodological issues raised by Defendant, these go more to the weight of the evidence rather than requiring its exclusion. See Rimowa Distrib., Inc. v. Travelers Club Luggage, Inc., 217 F. Supp. 3d 400, 409–10 (D. Mass. 2016) (refusing to dismiss the expert's "results altogether" but not giving them "definitive weight" due to "doubts whether the participants fairly represent a relevant segment of the consumer market"); Bern Unlimited, Inc. v. Burton Corp., 95 F. Supp. 3d 184, 203 (D. Mass. 2015) ("Bern contends that Simonson's expert report on secondary meaning is irrelevant because it was taken in 2014, and not at the time of first infringement. . . . Under Bern's theory, a company would have to undertake a preemptive survey prior to the time they allegedly first infringe, or the survey evidence would not be admissible. Such a requirement would be absurd . . . . Thus, courts have routinely admitted such evidence and examined the timing to determine the strength of the evidence."). Even when the "survey has a number of shortcomings . . . [that] may have been suggestive, . . . 'issues of methodology, survey design, reliability, . . . [and] critique of conclusions' . . . 'go to the weight of the survey rather than its admissibility.'" Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1037–38 (9th Cir. 2010) (second alteration in original) (quoting Clicks Billiards Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001)). None of the purported methodological flaws, even if

Defendant is correct that they are indeed flaws, are significant enough to render the expert testimony inadmissible.

Defendant cites two cases in which Ezell's surveys were excluded from litigation as evidence that the Court should do so here. [ECF No. 67 at 10]. These cases are substantially different factually, and the specific errors cited are inapplicable. In Deckers Outdoor Corp. v. Wal-Mart Stores, Inc., No. 20-cv-09521, 2024 WL 2208099, at *9 (C.D. Cal. Apr. 9, 2024), the product at issue was a "slipper and sandal" hybrid that was a "platform, sling back slide." Ezell's consumer universe was limited to those only who had or intended to purchase a pair of slippers costing approximately $50 or more, confusing the survey because of the ambiguous nature of the shoe at issue. Id. (emphasis added). There is no dispute here that the products at issue are boots,[5] and therefore the Wal-Mart court's reasoning is inapplicable. Similarly, Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc., 515 F. Supp. 3d 1061, 1072 (N.D. Cal. 2021), involved a very specific factual situation where the mark concerned a "very narrow group of individuals," specifically consumers of ultra-luxury Napa wines, and the survey universe was not properly limited to that narrow group. Id. The Court need not decide if UGG is as well-known as "Apple, Coca-Cola, or EverReady," id., to determine that the concerns in Vineyard House are absent here.

For these reasons, the Defendant's Motion to Exclude the expert opinion of Matthew Ezell [ECF No. 66] is DENIED.

---

[5] Defendant's expert Antonio Sarabia discusses extensively whether the UGG Ultra Classic Mini boot is a "boot" or a "bootie." [ECF No. 74-3 at 10–13]. This is not discussed in Defendant's briefing of its motion in limine regarding Ezell or its motion for summary judgment, and therefore the Court does not believe that this case is akin to Wal-Mart.

### 2.    Caroline de Baere

Plaintiff has also submitted an expert report of Caroline de Baere ("de Baere").  [ECF No. 74-7].  De Baere has thirty-seven years of experience in the footwear industry and is purportedly skilled in "trend research, footwear design, product development and manufacturing, merchandising, market analysis, product purchasing, and sales management."  [Id. at 4].  She has opined that (1) the UGG Classic Ultra Mini Trade Dress is comprised of a combination of non-functional elements; (2) there are numerous design alternatives available; (3) the Asserted Trade Dress has acquired secondary meaning; (4) there are no reasons for Primark's design choices other than intentional copying; and (5) these conclusions all inexorably lead to a finding of infringement.  [Id. at 7–9].

Defendant argues that de Baere should be excluded on several grounds relating to her qualifications.  Namely, that (1) she is biased, [ECF No. 70 at 10]; (2) she is unqualified to opine on infringement, likelihood of consumer confusion, or secondary meaning because they are conclusions of law, [Id. at 11–13]; and (3) she is unqualified to opine on consumer perception, secondary meaning, and damages as a footwear expert.  [Id. at 13–15].

As with Ezell, some of Defendant's issues with de Baere go to the weight of her testimony and her credibility, rather than to admissibility.  For one, an expert's "alleged bias is not a basis to exclude [her]. . . . At most, an expert's bias goes to the weight or credibility of [her] testimony."  Integrated Commc'ns & Techs., Inc. v. Hewlett-Packard Fin. Servs. Co., 478 F. Supp. 3d 126, 141 (D. Mass. 2020) (citations omitted).  De Baere's opinions on secondary meaning, likelihood of confusion, and damages as set forth in her report, moreover, are limited in scope and supported by her experience.  For example, she states that the UGG brand has achieved goodwill and that the infringement has caused damage to the UGG brand.  She does not

14

attempt to quantify damages, but simply identifies that infringement can damage goodwill, an opinion which could reasonably be formed by someone with decades of expertise in footwear and accessory branding.  [ECF No. 74-7 at 88–89].  Likewise, her opinions on secondary meaning and likelihood of confusion are supported by the vast materials she has looked at combined with her experience.  Therefore, de Baere will not be excluded on these bases.

The First Circuit has held however, that "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact."  Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997) (quotation omitted).  "[A]lthough experts may provide opinions on ultimate factual conclusions, they are not permitted to offer an opinion on an ultimate legal conclusion."  Mr. Doe v. Portland Pub. Schs., No. 20-cv-00461, 2022 WL 2755163, at *6 (D. Me. July 14, 2022) (citing Nieves-Villanueva, 133 F.3d at 100).  Therefore, de Baere's opinion that Defendant's product infringes on Plaintiff's trade dress, see Epic Metals Corp. v. Souliere, 99 F.3d 1034, 1037 (11th Cir. 1996) ("[t]o determine whether trade dress has been infringed is a question of law"), will be excluded.[6]

Beyond her qualifications, Defendant also disputes de Baere's methodology.  First, it notes her reliance on Ezell's surveys, which it argues are unreliable and therefore render her opinions unreliable.  [ECF No. 70 at 16–17].  Second, it argues that her opinions on secondary meaning are unreliable because the Asserted Trade Dress does not match the product de Baere discusses, and further, that she improperly relies on advertising evidence from outside of the

_____

[6] In contrast, secondary meaning and likelihood of confusion are factual questions.  See Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 614 (9th Cir. 1989) (holding that whether a trade dress has acquired secondary meaning is a question of fact); Gruma Corp. v. Mexican Rests., Inc., 497 F. App'x 392, 395 (5th Cir. 2012) ("The issue of likelihood of confusion is generally a fact question.").  Therefore, her conclusions on these issues need not be excluded on this basis.

U.S. and about different Deckers' products beyond the one at issue here.[7]  [Id. at 17–19].  Third, Deckers asserts that her opinion on the likelihood of consumer confusion is flawed because she relied on incorrect information about Primark's channels of trade and had an insufficient basis to infer intentional copying.  [Id. at 19–22].

Flowing from the Court's analysis regarding the admissibility of Ezell's testimony, the extent to which her opinions rest on his surveys goes to the weight to be afforded to her opinions rather than to their admissibility.  With regards to her evaluation of other evidence of secondary meaning, Defendant ignores that de Baere's report includes an analysis of significant volumes of data such as sales data, media coverage, and thousands of customer reviews that can serve as indirect evidence of secondary meaning.  [ECF No. 89-5 at 26, 66].  Finally, de Baere's analysis of Defendant's intent is based solely on her determination about the products themselves based on her experience.  [Id. at 87].  Her methodology, given her experience in the field, is sufficiently reliable to be admitted, and the factfinder may assign it whatever weight it deems appropriate.

Finally, Defendant has presented uncontradicted evidence that it does not use multiple channels of trade.  [ECF No. 70-2 at 11:21–24, 64:21–23].  Given that de Baere's conclusions regarding whether the two companies have the same channels of trade is incorrect, this portion of her testimony will be excluded.

The Court therefore DENIES the motion to exclude de Baere [ECF No. 68] except insofar as it GRANTS the motion to strike her opinion as to whether infringement occurred and as to Primark's channels of trade.

_____

[7] See supra note 4.

### 3.    Lenny M. Holden

Defendant offers Lenny M. Holden ("Holden") as an expert in fashion design to outline the similarities and differences between the Classic Ultra Mini Trade Dress, the UGG Classic Ultra Mini shoe, and Primark's Tan Faux Suede Mini shoe.  [ECF No. 74-1 ¶ 2].  Holden is an expert in the "design, development, and manufacturing segments" of the "shoe business."  [Id. ¶ 4].  His testimony consists of descriptions of the differences between elements of the Classic Ultra Mini Trade Dress and the Tan Faux Suede Mini, as well as a description comparing the Classic Ultra Mini Trade Dress to other products on the market.  See generally [id.]

Plaintiff raises two objections to the admission of Holden's testimony: (1) that his analysis violates the "anti-dissection" rule regarding the evaluation of trade dress, meaning that his opinion looks at the relevant products and trade dress too granularly, instead of evaluating the overall impression of the products at issue, [ECF No. 69-1 at 10–12]; and (2) that Holden's report is irrelevant because it addresses the wrong type of potential consumer confusion, [id. at 13].[8]

The Court finds that these concerns are not a sufficient basis to exclude Holden's testimony.  Evidence analyzing the individual elements of the purported trade dress is likely to be helpful to a jury.  Sanho Corp. v. Kaijet Tech. Int'l Ltd., No. 18-cv-05385, 2024 WL 3331657, at *3 (N.D. Ga. Jul. 8, 2024).  Plaintiff is free to provide its own evidence of the overall impression of the products at issue.  Moreover, Defendant correctly asserts that Plaintiff's experts present facts relevant to multiple theories of likelihood of consumer confusion.  See [ECF No. 74-7 at 83 (de Baere report addressing factors relating to all theories of likelihood of

_____

[8] The different types of consumer confusion that can be proved are discussed at greater length infra.

confusion)].  Defendant is therefore entitled to present rebuttal evidence on that basis.  See

Girard v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab., 16 F.3d 416, at *2 n.4

(10th Cir. 1993) (unpublished table decision) ("[A] party has a right to rebut adverse evidence.").

Plaintiff's motion in limine to exclude Lenny Holden [ECF No. 69] is DENIED.

### 4.    Antonio R. Sarabia II

Defendant seeks to use Antonio R. Sarabia II ("Sarabia") as an expert in fashion and

trade dress.  Sarabia is a former fashion executive and currently "advise[s] companies on

whether new designs for trade dress, fabric prints, labels, tags, and decorative stitching are

sufficiently different from their sources of inspiration to be original."  [ECF No. 74-3 at 6–7].

Plaintiff moves to exclude Sarabia on several grounds.  Specifically, it argues that (1) he

is unqualified as an expert, [ECF No. 71-1 at 7–9]; (2) his methodology in comparing the

Asserted Trade Dress to Defendant's product is not sufficiently rigorous and addresses the

elements of the asserted Trade Dress too granularly, [id. at 10–11, 16–17]; and (3) his test for

secondary meaning is contrary to the law, [id. at 12–16].

In reviewing this motion, the Court finds the Northern District of Georgia's decision in

Sanho Corp. v. Kaijet evaluating Sarabia's expert testimony in a trade dress matter to be

instructive.  First, like the Sanho court, the Court agrees that Sarabia is qualified as an expert.[9]

He has decades of experience in advising companies on trade dress and trademark matters.  See

Sanho, 2024 WL 3331657, at *1 ("Sarabia's 35-year experience in the development and

protection of visual design elements qualifies him as an expert on issues . . . relating to the

protectability of visual design elements.").  The Court likewise agrees that Sarabia's testimony

---

[9] As discussed infra, this is limited to his expertise on protectability of design elements, not legal
issues.

regarding visual differences between the two boots at issue here is helpful, especially given his background.  See id., at *2 (citing United States v. Brown, 415 F.3d 1257 (11th Cir. 2005) (for the proposition that testimony is admissible where "the expert's analysis relies solely on visual comparisons between the objects, combined with the expert's knowledge of the relevant field")).

Notably, the Sanho court excluded Sarabia's testimony regarding his self-created test for secondary meaning.  Sanho, 2024 WL 3331657, at *2.  As in that case, Sarabia's report here states that secondary meaning requires first and exclusive use.  [ECF No. 74-3 at 18–19].  But the Court agrees with Plaintiff that this is an incorrect statement of the law, and therefore should be excluded.  See Sanho, 2024 WL 3331657, at *2 ("Based on that two-factor test, Sarabia concludes that Sanho's marks have not acquired secondary meaning 'because Sanho is neither the exclusive user nor the first user' of its marks.  That conclusion is clearly based on the application of an incorrect legal standard.  And a conclusion based on an incorrect legal standard is unhelpful and misleading to the jury, and thus inadmissible under both Rules 702 and 403.") (cleaned up).  Moreover, the risks of prejudice are heightened due to Sarabia's legal background—it would be highly prejudicial to Plaintiff to allow an attorney to testify to a jury using an incorrect standard of law.  Id. at *1.  The Court therefore DENIES Plaintiff's motion in limine to exclude the expert opinion as to Sarabia [ECF No. 71], except with respect to his testimony about the legal standard for secondary meaning.

### 5.    Robert Griffin Wallace, Jr.

Defendant's final expert is Robert Griffin Wallace, Jr. ("Wallace").  [ECF No. 74-5].  Wallace is the managing partner of a branding consultancy.  [Id. ¶ 16].  As an expert, he has designed and fielded more than 75 surveys to determine infringement issues.  [Id. ¶ 19].  For this case, Wallace designed two surveys: one on secondary meaning and the other on the likelihood

of confusion.  [Id. ¶ 2].  Plaintiff's disputes with Wallace's inclusion speak to the surveys, rather than to Wallace's qualifications.

Both surveys had 400 participants of both genders between 18 and 65 "who have purchased or been involved in the purchase of casual shoes within the last 12 months and plan to continue to purchase these products in the next 12 months."  [ECF No. 74-5 ¶¶ 31, 33; id. at 36, 47].  Each showed participants four images of the UGG Ultra Classic Mini boot, including a top view, a side-top view, the sole, and the back.  [Id. ¶ 49].

The secondary meaning survey asked participants to view images "as if [they] were shopping for casual shoes" and showed them the images.  [ECF No. 74-5 ¶ 49].  It then asked participants if they believed that the shoe design comes from one source or is a "generic" design.  [Id.]  Notably, 49.5% of relevant consumers believed that the images showed a shoe from one brand or source.  [Id. ¶ 50].

The second survey, about the likelihood of confusion, started similarly to the secondary meaning survey, but subsequently showed another set of four images of the Primark Tan Faux Suede Mini boot at roughly the same angles.  [ECF No. 74-5 ¶¶ 51–52].  It asked participants if they believed the shoe was from the same or a different manufacturer as the first.  [Id.]  The result was that 38.5% of consumers believed that the Primark shoes came from the same source.  [Id. ¶ 53].

Plaintiff has two primary critiques of Wallace's surveys.  The first is relevance—specifically, that his likelihood of confusion survey tested the wrong theory of likelihood of consumer confusion.  [ECF No. 72-1 at 9–14].  Plaintiff, however, has also presented evidence relevant to multiple theories of consumer confusion.  See [ECF No. 74-7 at 83 (de Baere report addressing all of the factors considered by courts in likelihood of confusion analysis)].

Therefore, Defendant can do the same and the jury can then assign the evidence the appropriate weight.  See Girard, 16 F.3d 416, at *2 n.4 ("[A] party has a right to rebut adverse evidence.").

The second critique is that Wallace's methodology for both surveys was unsound.  [ECF No. 72-1 at 16–17].  With regard to both surveys, Plaintiff argues that Wallace's control images contain all of the features of the UGG Classic Ultra Mini trade dress.  [Id. at 22–23].  The control cell is therefore, according to Plaintiff, unreliable in removing "noise" from his survey, which renders his conclusions dubious.  [Id. at 22].  Additionally, Plaintiff argues that Wallace uses an overbroad survey universe.  [Id. at 18–21].  This argument mirrors Defendant's argument about Ezell, [ECF No. 67 at 10]; while Defendant argues that Ezell's use of only women interested in purchasing boots is too narrow, Plaintiff argues that Wallace's universe of "anyone between [18 and 65] who has or are planning on purchasing casual shoes"[10] is too broad because the vast majority of purchasers of the UGG Classic Ultra Mini boot are women.  [ECF No. 72-1 at 19].

Plaintiff also includes critiques specific to the likelihood of confusion survey.  One is the so-called "marketplace context," which focuses on the images used of the respective boots as well as the included images of where the boots could purportedly be sold.  [ECF No. 72-1 at 23–28].  Specifically, Wallace's surveys included four pictures of each boot, [ECF No. 74-5 at 38–41], and one of these pictures was of the sole.  Notably, the sole is not part of the asserted trade dress, and indeed Plaintiff has a separate trademark in the sun design on the sole.  [Id. at 24].  The use of the picture of a sole, given the fact that the Primark and UGG soles look distinct, purportedly skewed the survey.  [Id. at 24–25].  Finally, Plaintiff questions the format of the

_____

[10] Plaintiff's argument about the survey universe states that the age range used was 18 to 15; this is obviously an error, so the Court relies on Wallace's own statements of what the age range in the survey was, which was 18 to 65.  [ECF No. 74-5 at 36].

likelihood of confusion survey; Wallace uses the so-called <u>Squirt</u> method, [11] rather than the <u>Ever-Ready</u> method preferred by Plaintiff.  [<u>Id.</u> at 16–18].

Although some of these choices in methodology call into question the value of the surveys, the Court again decides that these concerns go to the weight of the evidence, rather than its admissibility.  <u>Fortune Dynamic</u>, 618 F.3d at 1037–38; <u>see</u> <u>Jordache Enters., Inc. v. Hogg Wyld, Ltd.</u>, 828 F.2d 1482, 1488 (10th Cir. 1987) (holding that "[t]he district court did not err in giving little <u>weight</u> to the survey results" where the survey did not resemble the true marketplace (emphasis added)); <u>Rimowa Distrib.</u>, 217 F. Supp. 3d at 409–10 (refusing to "dismiss [the expert's] results altogether" but not giving them "definitive weight" due to "doubts whether the participants fairly represent a relevant segment of the consumer market").  Plaintiff's counsel will be able to elicit the weaknesses in Wallace's surveys on cross-examination, and admitting the surveys is not unduly prejudicial to the Plaintiff.  The Court therefore <u>DENIES</u> Plaintiff's motion in limine to exclude Wallace [ECF No. 72].

### B.    Summary Judgment

#### 1.    Lanham Act Claim

As discussed <u>supra</u>, the key elements of a Lanham Act claim are the (1) use in commerce, (2) non-functionality of protected elements, (3) inherent distinctiveness or secondary meaning, and (4) likelihood of confusion.  <u>Annalee Mobilitee Dolls</u>, 2003 WL 22901680, at *9.

---

[11] The so-called "<u>Squirt</u>" format comes from <u>SquirtCo. v. Seven-Up Co.</u>, 628 F.2d 1086, 1089 (8th Cir. 1980).  "The 'Squirt' format presents a survey respondent with both of the conflicting marks.  [Unlike <u>Ever-Ready</u>, i]t does not assume that the respondent is familiar with the senior mark. . . .  When the conflicting marks are not seen side-by-side in the marketplace, showing the conflicting marks side-by-side in a survey can skew the results because this does not reflect actual marketplace conditions."  5 McCarthy on Trademarks and Unfair Competition § 32:174.50 (5th ed.).

Defendant argues that it is entitled to summary judgment because the Ultra Classic Mini Trade Dress is not used in commerce, [ECF No. 74 at 10–12], the Trade Dress does not have inherent distinctiveness or secondary meaning, [id. at 15–22], and there is no likelihood of confusion between its product and the Trade Dress, [id. at 22–29]. See generally [ECF No. 74]. Plaintiff argues that there are disputes of material fact as to each of these elements. See generally [ECF No. 89]. The Court evaluates these claims in light of the evidentiary rulings supra.

i.    Use in Commerce

Defendant argues that the Ultra Classic Mini Trade Dress is not used in commerce because the Trade Dress does not accurately describe the actual UGG Ultra Classic Mini boot.[12] Specifically, citing the Holden and Sarabia reports, it avers that the Trade Dress includes "exposed tufting" and a "thick, flat sole," and that these elements are not present in the UGG Ultra Classic Mini boot. [ECF No. 74 at 13–15]. Plaintiff counters that the overall impression of the Trade Dress is supported by pictures provided in the complaint, and therefore under the so-called "anti-dissection rule," Defendant's attempts to single out specific elements of the Trade Dress as not present in the product are insufficient to establish that the Trade Dress is not used in commerce. [ECF No. 89 at 9–10]. Moreover, Plaintiff produced evidence that the elements disputed by Defendant are part of the Classic Ultra Mini Trade Dress. [ECF No. 74-8 at 19–28, 44–48 (De Baere rebuttal report discussing these two elements)].

Plaintiff is correct that Defendant cannot overcome the asserted trade dress claim by taking the individual elements and arguing that none of them are protectable. See [ECF No. 89 at 10 (citing McCarthy on Trademarks) (emphasis added)]; I.P. Lund Trading ApS v. Kohler

---

[12] If the Trade Dress does in fact describe the UGG Classic Ultra Mini boot, there is no dispute that the boot is a commercial product. [ECF No. 90-1 ¶¶ 5, 23].

Co., 163 F.3d 27, 39 (1st Cir. 1998) ("The inquiry into distinctiveness turns on the total appearance of the product, not on individual elements."). This, however, is distinct from an argument that the trade dress elements are not present in the commercial product. None of Plaintiff's authorities speak to an inaccurately described trade dress. [ECF No. 89 at 10]. Indeed, the accurate identification of the elements of a trade dress are essential to the court's analysis. See Cent. Tools, Inc. v. Prods. Eng'g Corp., 936 F. Supp. 58, 65 (D.R.I. 1996) (holding that, while the "whole visual image" is what "acquire[s] exclusive legal rights as a type of identifying symbol of origin," "the discrete elements which make up that totality should be . . . identified" so that "the court . . . [can] coherently define exactly what the trade dress consists of" (quoting 1 McCarthy on Trademarks and Unfair Competition §§ 8.01[1][c])).

Nevertheless, the expert testimony that will be allowed at trial evinces a dispute of material fact as to whether the asserted elements of the Trade Dress do, in fact, refer to a particular commercial product, i.e. the Classic Ultra Mini boot. See [ECF Nos. 74-8 at 19–28, 44–48 (de Baere rebuttal report asserting that these elements are present in the Classic Ultra Mini boot); 74-1 ¶¶ 26–29, 36–40 (Holden report asserting that these elements are not present in the Classic Ultra Mini boot)]. Therefore, summary judgment on the issue of whether the trade dress at issue here refers to an actual commercial product is DENIED.

ii.    Secondary Meaning

Defendant argues that there is no competent evidence in the record showing that the Classic Ultra Mini Trade Dress has acquired secondary meaning sufficient to show that it is distinctive. [ECF No. 74 at 15–22]. Plaintiff argues that there is at least a dispute of material fact about this issue. [ECF No. 89 at 12–17].

"When a party seeks protection for an unregistered trademark, it is incumbent on that party to demonstrate affirmatively that its mark is distinctive (either inherently or through acquired secondary meaning)." Borinquen Biscuit Corp., 443 F.3d at 117.  Specifically, "[i]n a product-design case, the plaintiff must prove that the design has acquired 'secondary meaning.'" Bern Unlimited, Inc., 95 F. Supp. 3d at 205.  In the First Circuit, "secondary meaning" refers to a mark's "ability to tell the public that the [mark] . . . serves a special trademark function, namely, that it denotes a product or service that comes from a particular source." Nucleus Rsch. Inc. v. 3Sixty Insights Inc., No. 22-cv-11339, 2024 WL 4011987, at *2 (D. Mass. July 30, 2024) (quoting Bos. Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993)). "Among the factors courts generally look to in determining whether a term has acquired secondary meaning are (1) the length or exclusivity of use of a mark; (2) the size or prominence of the plaintiff's enterprise; (3) the existence of substantial advertising by plaintiff; (4) the product's established place in the market; and (5) proof of intentional copying." Bay State Sav. Bank v. Baystate Fin. Servs., 484 F. Supp. 2d 205, 214 (D. Mass. 2007).

"In [Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25 (1st Cir. 2001)], the First Circuit determined that the only direct evidence for secondary meaning is a consumer survey." Genesis Strategies, Inc. v. Pitney Bowes, Inc., 50 F. Supp. 3d 59, 65 (D. Mass. 2014), on reconsideration in part, No. 11-cv-12270, 2014 WL 4292830 (D. Mass. Aug. 27, 2014).  In such surveys, "50% or more of the consuming public associat[ing] a mark with the company's products" is typically viewed as the threshold for the establishment of secondary meaning.  Id. (quoting Bay State Sav. Bank, 484 F. Supp. 2d at 217).  This evidence is provided by Plaintiff via the expert testimony of Ezell, who concluded that 73% of the relevant survey

universe "associate the appearance of the Classic Ultra Mini boot with UGG or a single anonymous source."  [ECF No. 89-1 at 9].

Defendant argues that the survey taken by Ezell is so flawed that it does not provide competent evidence of secondary meaning.  [ECF No. 74 at 16–17].  As discussed supra, while Defendant may have valid critiques of the methodologies going to the weight that Ezell's surveys should be afforded, the survey ultimately does sufficiently test secondary meaning.  Contra Genesis Strategies, 50 F. Supp. 3d at 66 (holding that the survey was not competent evidence of secondary meaning where the expert "was unsure if the survey addressed secondary meaning because he did not know what it was" and "the survey only questioned existing customers who are already familiar with Plaintiff's product").  The Court therefore declines to find that "a fact finder could not rely on it to answer the question of whether consumers associate the aforementioned features . . . with a single source."  Id.  The validity of Defendant's experts' critiques and the weight the survey ought to be provided will be determined at trial.

Moreover, secondary meaning can be established through indirect evidence.  Yankee Candle, 259 F.3d at 43 ("Secondary meaning may also be proven through circumstantial evidence, specifically the length and manner of the use of the trade dress, the nature and extent of advertising and promotion of the trade dress, and the efforts made to promote a conscious connection by the public between the trade dress and the product's source.").  Defendant argues that, as was the case in Yankee Candle, Plaintiff has not demonstrated "a conscious connection by the public between the claimed trade dress and the product's source."  [ECF No. 74 at 18].  As an example, it claims that Plaintiff has not done so-called "look-for" advertising, which goes beyond "featuring" the product in advertising and specifically directs a consumer's attention to a particular aspect of a product.  [Id. at 19–20].

Plaintiff has presented evidence that the UGG Classic Ultra Mini boot has been sold since at least 2020, as well as evidence of sales and revenues earned, advertising campaigns and celebrity collaborations.  [ECF No. 89-5 at 17, 59, 67].  While Defendant is correct that Yankee Candle stands for the proposition that this alone is probably insufficient to support a finding of secondary meaning, 259 F.3d at 44–45, when combined with Plaintiff's direct survey evidence, there is a material dispute of fact as to whether Plaintiff has established secondary meaning.

Summary judgment is therefore DENIED as to secondary meaning.

### iii.    Likelihood of Confusion

Defendant argues that there is no likelihood of consumer confusion as a matter of law. Plaintiff responds that there is at least a dispute of material fact with respect to a likelihood of confusion.

The First Circuit has interpreted "likely to cause consumer confusion" to mean "more than the theoretical possibility of confusion."  Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008) (quoting International Association of Machinists v. Winship Green Nursing Ctr., 103 F.3d 196, 200 (1st Cir.1996)); see Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 9–10 (1st Cir. 2012) (same).  "In other words, allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'"  Bos. Duck Tours, 531 F.3d at 12 (quoting Winship Green Nursing Ctr., 103 F.3d at 201)  The reasonably prudent purchaser is not limited to the actual or potential buyer of the product, but also includes "persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner."  Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8, 11 (1st Cir. 2004) ("[L]ikelihood of confusion inquiry . . . includes others whose confusion

threatens the trademark owner's commercial interest in its mark.").  Courts in the First Circuit

consider a non-exhaustive list of factors, called the "Pignons" factors, to assess the likelihood of

confusion:

> (1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark.

Shell Co. (P.R.) v. Los Frailes Serv. Station, 605 F.3d 10, 22 & n.9 (1st Cir. 2010) (quoting

Winship Green Nursing Ctr., 103 F.3d at 201); see Pignons S. A. de Mecanique v. Polaroid

Corp., 657 F.2d 482, 487 (1st Cir. 1981) (same).  The inquiry is "highly fact-intensive."  Shell

Co., 605 F.3d at 22.

As to the first two factors, Defendant argues that individual elements of the Asserted

Trade Dress and the Tan Faux Suede Mini Boot are different, and that this factor therefore

weighs against likelihood of confusion.  [ECF No. 74 at 24–26].  As Defendant notes, however,

"[w]hen examining similarity, the Court must consider 'the total effect of the designation, rather

than a comparison of individual features.'"  [Id. at 24 (quoting Pignons, 657 F.2d at 487)].  The

"total effect" cannot be determined at summary judgment and should be left to the jury.  See

Mark Bric Display Corp. v. Joseph Struhl Co., No. 98-cv-00532, 2003 WL 21696318, at *13

(D.R.I. July 9, 2003) ("[B]ecause 'similarity' of the dress is determined by the total effect of the

designation, and not the individual aspects, this Court finds that there is at least a question of fact

as to whether the total effect of the [junior product] could contribute to a likelihood of confusion

with the [senior product].").

As to the third, fourth, and fifth factors,[13] the parties have at least raised disputes of material fact as to how Primark's products are advertised and whether the classes of purchasers are the same. Defendant has, at the very least, established that it only sells its own goods in stores, and likewise that its goods are only sold in stores. [ECF No. 70-2 at 11:21–24, 64:21–23]. On the other hand, Plaintiff has presented evidence that the Parties have similar customer bases and advertising mediums. [ECF No. 74-7 at 85–86]. Therefore, the Court cannot come to a conclusion as a matter of law on these factors.

As to the sixth factor, Plaintiff has provided survey evidence of actual confusion. Defendant argues, as it did with the secondary meaning survey, that this evidence is not competent. [ECF No. 74 at 27–28]. The Court again concludes that, as discussed <u>supra</u>, Defendant's arguments speak to the weight the factfinder ought to give the survey, rather than its competence. Therefore, there is a dispute of material fact as to whether the parties have established actual confusion.

As to the seventh factor, Plaintiff has provided expert evidence that the design of Defendant's shoe could have no other purpose than intent to copy. [ECF No. 89-5 at 9]. Defendant disputes this by claiming that "[m]ere knowledge of the existence of a competitor's mark is insufficient to prove bad faith." [ECF No. 74 at 28 (internal quotations omitted)]. This, however, mischaracterizes Plaintiff's argument and de Baere's findings. Rather, it is her opinion, based on her expertise in footwear design, that the nature of the design itself evinces an intent to copy because there could be no other reason for Defendant's design choices. [ECF No. 74-7 at 88–89]. Whether this view carries the day will be left to the jury.

---

[13] These factors are often considered together "because they tend to be interrelated." <u>Beacon Mut. Ins. Co.</u>, 376 F.3d at 19.

Finally, Defendant argues that the mark has no strength because the Asserted Trade Dress does not refer to an actual commercial product.  [ECF No. 74 at 28].  As this turns on an issue the Court has already determined should be left to the jury, it likewise will not make that determination here.

The Court notes that Plaintiff claims it is pressing a theory of post-sale confusion, under which the Pignons factors are weighed differently.  [ECF No. 89 at 18–19].  While it is true that "[a]n action for trademark infringement under the Lanham Act may be based on post-sale confusion of consumers other than direct purchasers," Montblanc-Simplo GmbH v. Staples, Inc., 172 F. Supp. 2d 231, 243 (D. Mass. 2001), preliminary injunction vacated, 175 F. Supp. 2d 95 (D. Mass. 2001), this is not a distinct analysis under the Pignons factors but is just one theory regarding the likelihood of confusion.  Because the Court finds questions of material fact as to all Pignons factors, it need not weigh them.

The Court therefore DENIES summary judgment on likelihood of confusion, and likewise DENIES summary judgment on the Lanham Act claim generally.

### 2.  State Law Claims

Because all of the state law claims arise under the same theory as the Lanham Act claim, see supra, summary judgment is likewise DENIED on Counts II–IV.

## IV.  CONCLUSION

The parties' respective motions in limine are DENIED, except with respect to de Baere's ultimate conclusion about infringement and channels of trade and Sarabia's testimony about the legal standard for secondary meaning, which are GRANTED.  Defendant's motion for summary

judgment [ECF No. 73] is <u>DENIED</u> and the parties will proceed to trial.

**SO ORDERED.**

May 16, 2025                                         */s/ Allison D. Burroughs*
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE